**Carolyn Sue WILLIAMS**

v.

**CIBA–GEIGY CORPORATION.**

Civ. A. No. 86–3717–LC.

United States District Court,
W.D. Louisiana,
Lake Charles Division.

May 18, 1988.

**574**

H. Gayle Marshall, Lake Charles, La., for plaintiff.

Lyn A. Batastini, Adams and Reese, New Orleans, La., for defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

VERON, District Judge.

In this diversity matter under Louisiana law, the plaintiff Carolyn Sue Williams has sued the defendant Ciba–Geigy Corporation in negligence and products liability seeking damages arising out of Stephens–Johnson syndrome, a serious skin condition known to be an adverse reaction to the defendant's product Tegretol (carbamazepine), a prescription drug the plaintiff had taken under a physician's supervision.

The defendant moved for summary judgment on all liability issues. The plaintiff filed an opposition. After hearing without oral argument before U.S. Magistrate James T. Trimble, Jr., the Magistrate issued a Report and Recommendation in which he recommended judgment in favor of the defendant as to all issues pertaining

to the adequacy of the warning and recommended denying summary judgment only as to the question of whether Tegretol was "unreasonably dangerous per se" on the grounds that the latter issue constitutes a jury question.

■ After an independent review of the record this court agrees with the Magistrate's findings in regard to the adequacy of the warning, and adopts the reasons assigned on page two of the March 1, 1988 Report and Recommendation filed by the Magistrate.[*]

■ The remaining issues are two. First, the defendant asserts that under Fed.R.Civ.Pro., Rule 8, the plaintiff is precluded from asserting the theory of "unreasonably dangerous per se" on opposition to the present motion where that theory was not asserted in the original complaint. The court declines to adopt this technical view which would deprive the plaintiff of a hearing on the merits even though the allegation had been from the outset that the product was unreasonably dangerous. Rule 8(e)(1) provides in part: "No technical forms of pleading or motions are required." Rule 8(f) provides: "All pleadings shall be so construed as to do substantial justice." The complaint placed the defendant on ample notice that the plaintiff was proceeding in products liability. The defendant is represented by able Louisiana counsel who must be presumed well-acquainted with the subspecies of products liability enumerated in *Halphen v. Johns–Manville Sales Corporation*, 484 So.2d 110 (La.1986), the stone tablet on which Louisiana's products liability law came down from the mount.

■ The final issue is whether an allegation that a product approved by the federal Food and Drug Administration for marketing as a prescription drug is "unreasonably dangerous per se" due to a known risk for which a legally adequate warning is provided constitutes a jury question precluding summary judgment. This court holds that on the record no jury question is presented and that, as a matter of law, the drug Tegretol is not "unreasonably dangerous

per se" even if that standard is applicable to a known and warned-of risk of a prescription drug under Louisiana law.

To begin with, this court does not view *Halphen* as having overruled settled Louisiana jurisprudence focusing manufacturer liability for *known* risks of prescription drugs on instances of inadequate warning, e.g., *Anderson v. McNeilab, Inc.*, 831 F.2d 92 (5th Cir.1987); *Kinney v. Hutchinson*, 468 So.2d 714 (La.App. 5th Cir.1985); *Cobb v. Syntex Laboratories, Inc.*, 444 So.2d 203 (La.App. 1st Cir.1983). What *Halphen* may have changed in such cases is the relevancy of "the state of medical knowledge at the time the warnings were issued," cf. *Kinney, supra*, 468 So.2d at 718, since under *Halphen*'s "per se" theory it is irrelevant "whether the manufacturer perceived or could have perceived the danger." *See, Halphen, supra*, 484 So.2d at 114. That issue, however, does not arise here since Stevens–Johnson syndrome was both known and made the subject of explicit warnings.

One post-*Halphen* Louisiana court of appeals decision questions altogether the applicability of the "unreasonably dangerous per se" theory in the closely analogous situation of a contact bond cement which was subject to governmental regulation including warning requirements due to its known and explicity-labelled flammability. *See, Jurovich v. Catalanotto*, 506 So.2d 662 (La.App. 5th Cir.1987). The distinction made in that case is that *Halphen* pertained to the formerly unknown and unwarned-of absestosis danger. 506 So.2d at 665. Nevertheless, *Halphen* does contain language implying the applicability of the theory, which focuses on the danger-in-fact of a product compared to its utility, to situations where the danger is known and signalled:

"A warning or other feature actually incorporated in the product when it leaves the manufacturer's control, however, may reduce the danger-in-fact."

*Halphen, supra*, 484 So.2d at 114; *Jurovich, supra*, 506 So.2d at 665.

[*] The complete text of the Report & Recommendation follows this opinion, see Appendix.

The fact that the pure risk-utility standard of "unreasonably dangerous per se" may apply to known and warned-of risks of prescription drugs does not mean, however, that evidence of a certain incidence of harm is sufficient to create a question of fact. The Fifth Circuit, in cases applying the risk-utility test to known and warned-of risks of prescription drugs, has consistently decided the question as a matter of law. In *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.) *cert. denied* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974) the Fifth Circuit affirmed a jury verdict in favor of the defendant in an oral polio vaccine case. In the trial court, jury interrogatories addressed the issues of causation, failure to warn and damages, but no interrogatory addressed the issue of "unreasonably dangerous per se." *See*, 498 F.2d 1264 at 1295 (Appendix A: Interrogatories). Nevertheless, upon reaching the issue of "unreasonably dangerous per se" on appeal, the Fifth Circuit found no grounds for remand but decided the issue as a matter of law, thus:

In determining whether placing a commodity on the market is "unreasonably dangerous per se", the reasonable man standard of the Restatement becomes the fulcrum for a balancing process in which the utility of the product properly used is weighed against whatever dangers of harm inhere[nt] in its introduction into commerce. Obviously, use of an unavoidably unsafe product always presents at least a minimal danger of harm, but only if the potential harmful effects of the product—both qualitative and quantitative—outweigh the legitimate public interest in its availability will it be declared unreasonably dangerous per se and the person placing it on the market held liable. Applying this standard here, the scales must tip in favor of availability. The evil to be prevented—poliomyelitis and its accompanying paralysis—is great. Although the danger that vaccinees may contract polio is qualitatively devastating, it is statistically miniscule. On balance then, marketing the vaccine is justified despite the danger.

498 F.2d at 1274 (footnote omitted). The "unreasonably dangerous per se" analysis in *Swayze v. McNeil Laboratories, Inc.*, 807 F.2d 464 (5th Cir.1987) is even more perfunctory, and that case can scarcely be called authority for the proposition that evidence of the occurrence of harmful side effects, without more, makes the risk-utility test a fact question. In that case the Fifth Circuit affirmed a directed verdict for the defendant, thereby approving the trial judge's refusal to submit the issue to the jury. *See*, 807 F.2d at 466. The court of appeal treated the issue thus:

Fentanyl, as the parties agree, is an "unavoidably unsafe" drug. By their very nature, "unavoidably unsafe" drugs present some element of harm. However, such a drug will be deemed unreasonably dangerous *per se*, and its producer held liable, only if the potential harmful effects of the product outweigh the legitimate public interest in its availability. Fentanyl, when administered under proper supervision, is an indispensable weapon in the health care arsenal. Although the present case presents an instance of improper supervision, fentanyl itself is not unreasonably dangerous *per se*.

807 F.2d at 468. The Louisiana court of appeal in *Jurovich v. Catalanotto, supra*, applying the risk-utility test *arguendo* used a similar analysis in that jury case:

The expert witnesses here explained the benefits of the product—ease of application, speed of evaporation of the solvents, strength of the bond—and its dangers—chiefly the flammability potential. They contrasted these with the alternative types of contact bond cements available, which are based on different solvent systems (chlorinated solvents or water-based latex). The other types of contact adhesives contained drawbacks that made them less attractive to both the amateur and professional users, for reasons of either safety or performance.

Further, the evidence indicated that extremely flammable adhesives (i.e., those based on petroleum distillate solvents) have been on the market for many years

and that millions of gallons have been used. Plaintiff failed to present sufficient competent evidence of other accidents to support his claim that the hazards of this product outweigh its utility. 506 So.2d at 665. Since Louisiana appellate courts have the power of fact review, *Jurovich* may not stand for the proposition that no jury question would have been presented therein had the issue been properly raised. That case, however, did not concern a prescription drug approved for marketing by the federal Food and Drug Administration or the strong public policy favoring access to beneficial pharmaceuticals, see the discussion *infra*.

Greatly influential on the analysis in *Reyes* and *Swayze* is the fact that pharmaceuticals, as "unavoidably unsafe" products, receive special treatment under § 402A of the Restatement (Second) of Torts. *Reyes* was decided under Texas law and *Swayze* was decided under Mississippi law. Both states have adopted the Restatement's § 402A. Comment *k* to that section states, in pertinent part:

> There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use ... Such a product, properly prepared and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous ... [this] is true of many ... drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician ... The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

Restatement (Second) of Torts, § 402A, Comment *k; see also Swayze, supra,* 807 F.2d 464, 468; *Reyes supra,* 498 F.2d 1264, 1274.

This court has no doubt but that under Louisiana law, equal heed should be given to the principles of comment *k.* The codal framework upon which the Louisiana law of products liability is built possesses a long-acknowledged compatability with the principles set forth in § 402A and its comments. The risk-utility test adopted in *Halphen* was developed under that section, *see* 484 So.2d 110, 114 n. 2. In *DeBattista v. Argonaut–Southwest Insurance Co.,* 403 So.2d 26 (La.1981), the Louisiana Supreme Court stated:

> The history of strict liability in Louisiana indicates the requirement that a defective product must be "unreasonably dangerous" came into our jurisprudence due to the pervasive influence of section 402A of the Restatement (Second) of Torts after its publication in 1965. Louisiana's law in the products liability area has been described by commentators as closely approximating that of common law states following the Restatement (Second) of Torts § 402A.

403 So.2d at 30. The court went on in its analysis to rely on comments *i* and *g* under § 402A. *See,* 403 So.2d at 31.

 In light of the wise principles embodied in comment *k,* it is presumptively inappropriate for a jury to apply the pure risk-utility test of "unreasonably dangerous per se" to a known and warned-of risk of a prescription drug. Such risks have already been considered in the arduous risk-utility scrutiny of the expert Food and Drug Administration's approval procedures. The plaintiff desirous of having such a risk submitted to a jury must affirmatively show the propriety of the court's so doing. Rather than simply permitting juries to apply, haphazardly and case-by-case, the risk-utility test whenever harm results, the court must require, as a part of the plaintiff's burden of producing evidence, an articulable basis for disregarding the FDA's determination that the drug should be available. For instance, a fact question may arise where the plaintiff produces evidence tending to show that FDA approval was based on erroneous data or on an assumption that the incidence of

harmful effects would be significantly lower than the actual incidence the plaintiff can objectively demonstrate. Or, the plaintiff may make out a fact question by producing evidence tending to show that notwithstanding the utility of the drug, the qualitative and quantitative harmful effects, although known and warned of, are such that reasonable minds could conclude that the FDA manifestly erred in its finding that the societal benefits of access to the drug are not outweighed by the risks. By meeting this burden of producing evidence, a plaintiff would show the propriety of a jury determination in that some degree of uniformity of decision could result instead of the "blatantly inconsistent results" which are abhorred by the law, *see Perkins v. F.I.E. Corp.*, 762 F.2d 1250, 1274 n. 68 (5th Cir.1985), and which would undoubtedly follow from the use of minimal criteria for the sufficiency of evidence to constitute an issue of fact under the pure risk-utility test. *See id.*

Mindful of the foregoing guidelines, the court now turns to the record. The defendant (mover) has submitted a copy of the package insert provided with Tegretol, a copy of the Tegretol entry in the *Physician's Desk Reference* (PDR), and the affidavits of five of the plaintiff's treating physicians, all of whom consider the warnings of Stevens–Johnson syndrome adequate and four of whom further consider Tegretol not to be "defective."

The plaintiff has submitted as her opposition exhibits bibliographical listings accompanied by abstracts of the contents of each listing along with counsel's affidavit as to how the listings were obtained. Under the Federal Rules of Evidence, Rule 803(4), "[s]tatements made for purposes of medical diagnosis or treatment" are excepted from the general exclusion of hearsay. The form in which the statements come to this court constitutes double hearsay, but for purposes of the present motion they will be considered trustworthy. However, such statements, even though taken as true, must stand on their own merits insofar as what they tend to prove.

There is no evidence that the FDA's initial or continuing permission to market Tegretol is based on erroneous data or assumptions. Nor does the record reflect what the condition was, in the plaintiff's case, that caused Tegretol to be prescribed.

Tegretol is effective for two basic medical purposes: for the control of epileptic symptoms including psychomotor and grand mal seizures, and for relief of trigeminal neuralgia. The latter condition is defined in *Dorland's Illustrated Medical Dictionary* (24th ed. 1965) as "neuralgia due to involvement of the gasserion ganglion and the root and branches of the trigeminal nerve, and marked by pain along the course of the trigeminal nerve." *Id.* at 1002. "Neuralgia" is defined as "paroxysmal pain which extends along the course of one or more nerves." *Id.* Plate XXXIII of *Dorland's, supra*, shows the location of the trigeminal nerve, so that a layperson might define "trigeminal neuralgia" as suddenly recurring or intensifying severe pain focused roughly in the center of the head below the brain.

No evidence in the record tends to impugn the utility of Tegretol. There is no showing that any drug other than carbamazepine is effective in treating trigeminal neuralgia. Tegretol is indicated only for those sufferers of psychomotor and grand mal seizures who do not respond to, or are endangered by, more conventional anticonvulsants which have serious side effects of their own (one of the most common is phenobarbitol). One of the abstracts submitted by plaintiff outlines dangers of treating liver-damaged patients with carbamazepine, especially in conjunction with other hepatoxic drugs, however the "[a]uthors stress that physicians should not be discouraged from using carbamazepine as a valuable anticonvulsant ..." (ATLA Abstract 27). The consequences of the nonavailability of Tegretol for those patients who suffer serious seizures, which can be fatal if not controlled, but who cannot take other anticonvulsants, would be grave indeed.

Proper "risk" evidence for purposes of the risk-utility test is not a mere roster of

isolated incidents. Rather, "risk" in a vaccine or pharmaceutical case, as with other cases, concerns not only the qualitative harmful effect, but also the quantitative harm or "incidence" of serious adverse effects, that is, the ratio of instances of harm compared to the total use or consumption of the product. Although the danger may be devastating to those individuals who experience the worst effects, the incidence may be statistically small and the composite risk may not outweigh the value of a high utility drug. *See, Reyes v. Wyeth Laboratories, supra,* 498 F.2d at 1274.

There is no question that the qualitative harmful effect of carbamazepine for some individuals can be devastating, indeed fatal, especially where interaction with other prescription drugs is a factor. Many of the possible non-fatal side effects are serious and loathsome conditions, some reversible, some not.

The quantitative risk evidence, however, is very scant. The vast majority of the abstracts submitted by plaintiff simply attribute side effects in particular cases to carbamazepine. Many of the side effects attributed to the drug result from other anticonvulsants as well. Many of Tegretol's drawbacks are associated with its use for conditions not indicated in the manufacturer's insert or PDR disclosure, such as for alcoholism withdrawals where pre-existing liver damage is often a factor and for psychiatric affective disorders.

Of the two hundred forty-one abstracts, only three not concerned with drug interactions contained incidence information. One entry cited "25—65% incidence of overall toxic effects from Carbamazepine." (ATLA Abstract 7). The abstract does not give the size of the tested group. Even viewed in the light most favorable to plaintiff, "overall toxic effects" must be found to include non-serious effects attributed to Tegretol such as drowsiness, dizziness, unsteadiness and nausea. A high incidence of *overall* toxic effects in a strong drug such as an anticonvulsant for epilepsy is of little probative value in regard to risk-utility. Cancer chemotherapy may well entail a 100% incidence of relatively serious toxic effects, yet its utility undoubtedly outweighs the *certainty* of the poisoning, nausea, hair loss and weight loss involved. ATLA Abstract 16 cites "[a]dverse effects ... in 50% of patients with higher serum concentrations [over 200 mg. daily]." Again, adverse effects of this incidence must include mild and non-serious effects, and the number of patients studied is not given. Moreover, the datum indicates reduced risk at lower serum levels. Entry 30 of the 1980–85 Medline list refers to a "low incidence of adverse effects." ATLA Abstract 10 cites "severe side effects" in 23 out of 192 patients given carbamapezine. In terms of scientific studies this sample space is very small, but assuming the approximately 10–12% risk of severe side effects, where doctors have prescribed this drug for patients with the indicated severe and life-threatening conditions and no alternative hope for treatment, reasonable minds could not find this incidence too high.

Finally, as stated above, the risk-utility test for "unreasonably dangerous per se" under *Halphen v. Johns–Manville Sales Corporation, supra,* includes assessment of to what extent warnings incorporated in the product reduce its danger-in-fact. 484 So.2d at 114. In the case of prescription drugs which are unavailable to the consumer except by prescription from the treating physician, warning information listed in the PDR should be considered as part and parcel to the product. In this case, the package insert contains substantially or identically the same warnings and information listed in the PDR. These warnings are very clear, frank, and comprehensive about the dangers of the drug and ways of reducing the risk. These warnings so greatly diminish the product's danger-in-fact that for this reason alone no reasonable trier of fact could conclude that this highly utile medicine is unreasonably dangerous per se.

That being the case, there remains no genuine issue of material fact and the defendant is entitled to judgment as a matter of law. Accordingly, the motion of defendant Ciba–Geigy Corporation for summary judgment is GRANTED.

APPENDIX

REPORT AND RECOMMENDATION
OF MAGISTRATE

On December 29, 1986, plaintiff brought a products liability action against Ciba–Geigy Corporation, alleging that she developed Stevens–Johnson Syndrome as a result of taking the prescription drug Tegretol, which was manufactured by the defendant. Plaintiff alleges that the drug was unreasonably dangerous for normal use and that the defendant was negligent in failing to adequately warn physicians and others dispensing the drug of the dangers inherent in its product.

On November 5, 1987, defendant filed a motion for summary judgment, asserting that under Louisiana law, the drug manufacturer had discharged its duty to the consumers of its prescription drug since it informed prescribing physicians of the dangers of harm from the drug through package inserts and listing in the Physician's Desk Reference. Plaintiff filed an opposition to defendant's motion on February 8, 1988, contending that Tegretol is unreasonably dangerous per se, which would render the manufacturer liable despite the law cited by the defendant. This motion is presently before the court.

*Analysis of Law and Facts*

It is settled under Louisiana law, that a drug manufacturer has discharged its duty to consumers of its prescription drugs when it has reasonably informed prescribing physicians of the dangers of harm from such a drug. *Anderson v. McNeilab, Inc.*, 831 F.2d 92 (5th Cir.1987); *Cobb v. Syntex Laboratories, Inc.*, 444 So.2d 203 (La.App. 1st Cir.1983). In *Anderson, supra,* the Fifth Circuit specifically determined that the warnings of side effects contained in drug package inserts and listings in the Physician's Desk Reference were adequate to discharge the manufacturer's duty to consumers under Louisiana law.

Attached to defendant's motion for summary judgment are the affidavits of several of the plaintiff's treating physicians, which refer to their awareness that the package insert and the Tegretol listing in the Physician's Desk Reference specifically warn of the risk of Stevens–Johnson Syndrome. All of the physicians stated that they considered the warnings adequate. Defendant has also attached a copy of the Tegretol package insert, which specifically states that Stevens–Johnson Syndrome was one of the adverse reactions which had been reported from the use of Tegretol. It is clear that under Louisiana law, defendant has fulfilled its duty to consumers of its prescribed medication when it reasonably informed prescribing physicians of the dangers of harm from the use of the product in its package insert and Physician's Desk Reference listing.

Plaintiff, however, asserts Tegretol is unreasonably dangerous per se under the new theory of recovery under products liability set forth in *Halphen v. Johns–Manville Sales Corp.*, 484 So.2d 110 (La.1986). The *Halphen* court defined this category as follows:

"A product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of the product."

484 S.2d at 114.

Defendant asserts that the unreasonably dangerous per se theory is inappropriate in a drug products liability case. The recent Fifth Circuit case of *Swayze v. McNeil Laboratories, Inc.*, 807 F.2d 464 (5th Cir. 1987), however, held that a prescription drug will be deemed unreasonably dangerous per se, and its producer held liable, if the potential harmful effects of the product outweigh the legitimate public interest in its availability. The landmark Fifth Circuit case of *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.1974), cert. denied, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974), also recognized the applicability of this theory to drug products liability cases. *Reyes* stated the rule as follows:

"... Only if the potential harmful effects of the product—both qualitative and quantitative—outweigh the legitimate public interest in its availability will it be declared unreasonably dangerous per se

and the person placing it on the market held liable."

498 F.2d at 1274.

In a footnote, the *Reyes* court cited several factors involved in making the determination as to whether a product is unreasonably dangerous per se, including the following:

"(1) The usefulness and desirability of the product,

(2) The availability of other and safer products to meet the same need,

(3) The likelihood of injury and its probable seriousness,

(4) The obviousness of the danger,

(5) Common knowledge and normal public expectation of the danger (particularly for established products),

(6) The avoidability of injury by care in use of the product (including the effect of instructions or warnings), and

(7) The ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive."

498 F.2d at 1274, n. 17.

Defendant asserts that the risk-utility test (unreasonably dangerous per se theory) is unsuitable in cases in which the alleged dangers of the product are known, citing *Jurovich v. Catalanotto*, 506 So.2d 662 (La.App. 5th Cir.), writ denied, 508 So.2d 87 (La.1987). The court in *Jurovich* stated that "a warning or other feature actually incorporated in the product when it leaves the manufacturer's control *may* reduce the danger-in-fact of the product." (emphasis added) 506 So.2d at 665. This theory is not dispositive of the issue in this case, as evidenced by the insertion of the discretionary word "may". The *Jurovich* court stated that this case was an unsuitable one in which to apply the *Halphen* category of unreasonably dangerous per se, in light of the plaintiff's failure to present sufficient competent evidence of other accidents to support his claim that the hazards of the product (contact bond cement) outweighed its utility, and in light of the plaintiff's failure to follow the warnings and directions on the can.

In the present case, however, plaintiff has submitted excerpts from various medical journals which outline many of the adverse side effects which have been reported from the use of Tegretol. On the contrary, the affidavits of various physicians attached to defendant's motion for summary judgment state that the Tegretol prescribed for the plaintiff was not defective, and that they considered the warnings in the package insert and the Physician's Desk Reference adequate. The record does not, however, contain any information as to the reason the drug was prescribed for the plaintiff, or any information as to the percentages of adverse as opposed to beneficial results obtained from the use of the drug.

It is the opinion of the undersigned that a genuine issue of material fact exists as to whether the defendant's product was unreasonably dangerous per se. It is therefore recommended that defendant's motion for summary judgment be denied.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C), failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of service can result in the waiver of a de novo district court review.

THUS DONE AND SIGNED, in Chambers, at Lake Charles, Louisiana, on this 1st day of March, 1988.

/S/ James T. Trimble, Jr.

JAMES T. TRIMBLE, Jr.
UNITED STATES MAGISTRATE