United States Court of Appeals,

Fifth Circuit.

No. 92-3063.

Daniel JOHNSTONE, Deceased, Plaintiff,

Leslie v. Johnstone, in Her Capacity as the Personal Representative of the Estate of Daniel Johnstone, et al., and the Estate of Daniel Johnstone, Deceased, Plaintiffs-Appellees Cross-Appellants.

v.

AMERICAN OIL CO., et al., Defendants,

Keene Corporation, Defendant-Appellant Cross-Appellee.

John HANNON, et al., Plaintiffs,

v.

WATERMAN STEAMSHIP CORPORATION, et al., Defendants.

Nov. 29, 1993.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before JOHNSON, JOLLY, and JONES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Daniel Johnstone, a Jones Act seaman, died of mesothelioma caused by his exposure to asbestos. Although the jury found that the utility of Keene Corporation's asbestos insulation outweighed its risks, the magistrate judge entered judgment notwithstanding the verdict on the ground that Keene's evidence of the utility of its products was irrelevant. Keene appeals from the JNOV and from the allocation of proceeds from the plaintiffs' settlements with other defendants. The plaintiffs cross-appeal from the allocation of settlement proceeds. We REVERSE the judgment notwithstanding the verdict, and REMAND the case for entry of judgment in favor of Keene in accordance with the jury's verdict.

I

Daniel Johnstone sailed on various vessels equipped with asbestos-containing products from 1944-1946 and from 1959-1984. He was a bricklayer from 1947 until 1959. In his deposition, Mr.

Johnstone testified that he stopped being a bricklayer and went back to sea because the pay was better and he wanted to receive vacation, medical, and retirement benefits. Mr. Johnstone testified that every ship he sailed on contained asbestos, and that he was exposed to many different types of asbestos products manufactured by many different companies. Four of those vessels, on which Mr. Johnstone sailed in 1964 and from 1967 through 1978, and which were constructed during World War II, contained steam pipes and engine room boilers insulated with asbestos insulation manufactured by Keene's predecessors.[1]

## II

Mr. Johnstone and his wife, Leslie, filed suit against Mr. Johnstone's shipowner employers and various manufacturers of asbestos-containing materials, including Keene, pursuant to the Jones Act and general maritime law. Mr. Johnstone died during the pendency of these proceedings, and the complaint was amended to assert a wrongful death claim by Mrs. Johnstone and her children.

The action was tried using a procedure referred to as "reverse bifurcation." Medical causation and damages were determined in the first phase of the trial, and liability was determined in the second phase. The Phase I trial was conducted in November 1990, at which time the only remaining defendants were Keene and Owens Corning Fiberglas Corporation. At the close of the plaintiffs' case, the magistrate judge granted a directed verdict dismissing the plaintiffs' claims for loss of society, pursuant to *Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990).

The Phase I jury found that Mr. Johnstone's death was caused by mesothelioma (an asbestos-related disease), and awarded $375,000 for the mental anguish and pain and suffering of Mr. Johnstone. Pursuant to an agreement between the parties and by court order, medical and funeral expenses of $27,552.18 were added to the verdict, for a total verdict of $402,552.18. Thereafter, the plaintiffs settled with Owens Corning, leaving Keene as the only defendant.

The Phase II trial on liability was conducted in August 1991. The Phase II jury found that Mr. Johnstone was exposed to asbestos-containing products manufactured by Keene, and that such

---

[1]Although it is undisputed that the asbestos products at issue were manufactured by Keene's predecessors, we will refer to Keene and its predecessors as Keene.

exposure was a substantial contributing cause of his mesothelioma. However, it found that Keene's products were not unreasonably dangerous per se.

The district court granted the plaintiffs' motion for judgment notwithstanding the verdict. Keene filed a motion for reconsideration of the JNOV and to amend the judgment to allow set-offs for settlements by the plaintiffs with other defendants. The district court denied Keene's motion for reconsideration of the JNOV, but granted, in part, its motion to amend, allowing certain set-offs to the judgment. Keene appeals from the grant of JNOV and from the computation of set-off amounts. The plaintiffs cross-appeal on the set-off issue.

### III

### A

Our review of the grant of JNOV is governed by *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (*en banc* ):

> On motions for directed verdict and for judgment notwithstanding the verdict, the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... A mere scintilla is insufficient to present a question for the jury.... However, it is the function of the jury as the traditional finder of facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Id.,* at 374-75.

At trial, the plaintiffs proceeded solely on the theory that Keene's products were unreasonably dangerous per se under Louisiana law.[2] Under Louisiana law, "[a] defective product is one that is "unreasonably dangerous to normal use.' " *Bloxom v. Bloxom,* 494 So.2d 1297, 1302 (La.App.2d Cir.1986) (quoting *Weber v. Fidelity & Casualty Ins. Co. of N.Y.,* 259 La. 599, 250 So.2d 754, 755 (La.1971), *aff'd,* 512 So.2d 839 (La.1987). " "Normal use' is a term of art that includes all intended

---

[2]The plaintiffs' claims were governed by general maritime law. "In developing general maritime law, courts may apply state law." *Sullivan v. Rowan Cos., Inc.,* 952 F.2d 141, 148 (5th Cir.1992). The district court, with the agreement of the plaintiffs and Keene, applied Louisiana law.

uses, as well as all foreseeable uses and misuses of the product." *Bloxom v. Bloxom,* 512 So.2d 839, 849 (La.1987). "[T]he question of whether a product is defective is ordinarily one of fact." *Willett v. Baxter Int'l, Inc.,* 929 F.2d 1094, 1097 (5th Cir.1991).

Under the unreasonably dangerous per se theory, as set forth by the Louisiana Supreme Court in *Halphen v. Johns-Manville Sales Corp.,* 484 So.2d 110 (La.1986),[3] "[a] product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of the product." *Id.* at 114.

> This theory considers the product's danger-in-fact, not whether the manufacturer perceived or could have perceived the danger, because the theory's purpose is to evaluate the product itself, not the manufacturer's conduct. Likewise, the benefits are those actually found to flow from the use of the product, rather than as perceived at the time the product was designed and marketed. The fact that a risk or hazard related to the use of a product was not discoverable under existing technology or that the benefits appeared greater than they actually were are both irrelevant.... Under this theory, the plaintiff is not entitled to impugn the conduct of the manufacturer for its failure to adopt an alternative design or affix a warning or instruction to the product. A warning or other feature actually incorporated in the product when it leaves the manufacturer's control, however, may reduce the danger-in-fact.

*Id.*

## B

### (1)

The jury was presented with evidence concerning both the risks and utility of Keene's asbestos-containing products. Evidence of the risks included the following:

1. *Asbestos-Related Diseases.* Inhalation of asbestos fibers causes life-threatening or disabling diseases, including asbestosis, malignant mesothelioma, benign asbestos-related pleural disease, atelectasis (lung collapse), diffused pleura fibrosis, and carcinoma of the lung, larynx, and esophagus.

2. *Mesothelioma and Amosite Asbestos.* The Keene products at issue contained amosite asbestos fibers.

The plaintiffs' expert pathologist, Dr. Victor Roggli, testified that, although all three types of

---

[3]This case is governed by *Halphen* because it was commenced prior to the effective date of the Louisiana Products Liability Act of 1988, La.Rev.Stat. §§ 9:2800.51-2800.59 (effective September 1, 1988). The Act does not include the unreasonably dangerous per se theory of product liability. *See, e.g., Sharkey v. Sterling Drug, Inc.,* 600 So.2d 701, 706 n. 2 (La.App. 1st Cir.1992).

commercially-used asbestos fibers (amosite, chrysotile, and crocidolite) can cause diseases, there is some doubt in the scientific community about whether pure chrysotile can cause mesothelioma. He testified that both amosite and crocidolite cause mesothelioma, but crocidolite seems to be a more powerful, potent cause of mesothelioma than other types of asbestos. He also testified that seventy percent of the fibers found in Mr. Johnstone's lungs were amosite; no crocidolite or chrysotile was found (the remaining fibers were not asbestos fibers). He testified further that amosite fibers were present in virtually all of the 600 cases of mesothelioma he has studied. According to Dr. Roggli, the more asbestos a person is exposed to, the more likely that person is to suffer from mesothelioma; once the disease is started, additional exposures are not important.

Keene's expert pathologist, Dr. Harry Demopolous, testified that 90-957 of mesotheliomas are caused by the crocidolite form of asbestos. Out of the 340 mesotheliomas Dr. Demopolous studied, 338 were caused by crocidolite. He testified that the body defends itself "very, very well" against amosite asbestos fibers. According to Dr. Demopolous, the epidemiologic studies demonstrate that amosite asbestos, as it comes out of the ground, can cause mesothelioma; however, there is no epidemiological data to show that processed amosite asbestos has the capability of causing mesothelioma.

3. *Government Ban.* Asbestos is the only substance that has been banned from commercial usage by the Occupational Safety and Health Administration. It was banned in 1972.

4. *Government Standards for Exposure.* There has never been a dose of asbestos identified below which no disease will occur. The current United States government standard is .2 fibers per milliliter of air (down from 2 fibers per milliliter). A standard of .1 fiber per milliliter of air has been proposed.

6. *Risks of Use of Asbestos Insulation.* The plaintiffs' expert pathologist, Dr. Victor Roggli, testified that he would not use asbestos to insulate his home if he was going to be exposed to any airborne dust created from using it. He also testified that, from the standpoint of a worker's health, he would not advise that they handle asbestos-containing pipe insulation without any respiratory or other protection. The plaintiffs' expert naval architect, John Boylston, similarly testified that he would

not use asbestos-containing insulation in the construction of a ship today because (1) it is prohibited, and (2) there are other, better types of insulation available. Boylston also testified that a person must be certified or licensed to handle asbestos today, and must wear a "space suit." Keene's expert pathologist, Dr. Harry Demopolous, testified that asbestos insulation should be wet before being handled to keep the dust from becoming airborne, but that asbestos insulation could be safely used with proper instruction.

7. *Warnings.* The parties stipulated that Keene's predecessors placed warnings labels on their products in the mid-1960s. Mr. Johnstone testified, however, that he never saw any warnings.

(2)

Evidence of utility included the following:

1. *Commercial Usefulness.* Commercial asbestos fibers have certain common characteristics that make them very useful industrially: resistance to heat, resistance to chemical corrosion, some degree of flexibility, and high tensile strength.

2. *Heat Insulating Properties.* If the boilers, steam lines, and turbines in steamships were not insulated, the heat loss would be so tremendous that there would be no steam to turn the turbine. The purpose of insulating the steam pipes was to retain the heat in the pipes. Without the insulation, the pipes would be from 500 to 1000 degrees, and it would not have been possible for men to work in the engine rooms. In his deposition, Mr. Johnstone testified that the steam pipes on the ships on which he sailed were "super-heated," and that asbestos insulating products were used to reduce the heat in the engine room and to prevent people from getting burned. It was necessary to repair insulation in the engine rooms so that no one would get burned on the hot steam lines.

3. *Government Specifications.* In the 1940s, ships were required to be built to United States Coast Guard standards. Asbestos-containing materials, such as pipe insulation, were on the Coast Guard's approved list of materials. Up until 1970, the plaintiffs' expert, Boylston, as a naval architect, specified asbestos materials for use in the construction of vessels because such materials were required by the Maritime Administration specifications. The four ships on which Mr. Johnstone was exposed to Keene's products were built in the 1940s. Replacing insulation is an expensive operation.

Boylston testified that it would be impractical to take out the original insulation in engine rooms of ships built in the 1930s, 1940s, and 1950s.

4. *The MORROW CASTLE Incident.* On cross-examination, Keene questioned the plaintiffs' expert, Boylston, about the MORROW CASTLE incident in 1938. The plaintiffs' relevancy objection was overruled. Boylston testified that the MORROW CASTLE was a large passenger ship that caught fire off the coast of New Jersey, causing the loss of over 1,000 lives. According to Boylston, the MORROW CASTLE fire was "a pivotal accident in the marine industry," which precipitated requirements that all ships be constructed with inflammable materials, including asbestos. Boylston testified that 857 magnesium/157 asbestos products (such as Keene's) have been very successful in preventing accidents such as the MORROW CASTLE incident.

5. *"Asbestos Won the War."* Without objection by the plaintiffs, Keene's expert, Dr. Demopolous, testified that amosite, as an asbestos-insulating substance, was eminently important. During the war years, it was classified as a restricted substance and was under the complete domination of the Government. The Government considered it so valuable that there were stiff penalties, and one could be accused of treasonous crimes if asbestos was not used according to Government specifications. It was important to insulate the hot pipes on warships and merchant vessels. During the war years, 1300 warships were created. Nearly 6,000 merchant ships were built. The pipes and boilers of all were insulated with asbestos because it offered unique, lightweight, and yet efficient, insulation against the heat.

6. *Utility of Amosite Asbestos.* Keene's expert, Dr. Demopolous, testified, without objection from the plaintiffs, that the utility of amosite asbestos was described in a January 1946 article in the "Journal of Hygiene and Toxicology," as follows: "The chief reasons for the wide use of amosite felt in pipe covering in navy work are its low thermal conductivity, light weight, strength and refractoriness. When the felt and pipe covering were first developed, we were still building vessels under the Washington Treaty of Limitations in tonnage, and every pound saved meant that much more armor, guns or ammunition for a given displacement, to say nothing of the more economic operations for the weight involved in insulation."

C

At the close of all the evidence, the plaintiffs moved for a directed verdict on the ground that there had been no showing of the utility of Keene's products during the time period that Mr. Johnstone was exposed to them. The magistrate judge denied the motion, stating: "That's a question of fact. Sufficient evidence has been lodged with the jury."

The jury was instructed as follows:

> A product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of the product. That is, the product is dangerous to an extent beyond that contemplated by an ordinary consumer who purchases or uses the product. Under this theory of recovery, you should consider the product's danger-in-fact, not whether the manufacturer perceived or could have perceived its danger, because the theory's purpose is to evaluate the product itself, not the manufacturer's conduct. Likewise, the benefits are those actually found to flow from the use of the product at the time that Mr. Johnstone sustained an injury, rather than the benefits perceived at the time the product was designed and/or marketed. The fact that a risk or hazard related to the use of a product was not discoverable under existing technology or that the benefits appeared greater than they actually were are both irrelevant. However, a warning or other feature actually incorporated in the product when it leaves the manufacturer's control may reduce the danger in fact. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of, or obvious to the ordinary user.

> In weighing the benefits that flowed from asbestos products at the time of Mr. Johnstone's injury, you must consider that a person suffering from a latent disease such as asbestos related mesothelioma sustains an injury at the time that he is exposed in sufficient quantities of asbestos to cause the disease, rather than on the date that his condition is diagnosed or manifested by physical symptoms.

> Therefore, you must determine from the evidence presented the time period during which it was possible for Mr. Johnstone to have contracted mesothelioma, and then you must weigh the benefits flowing to society from the asbestos products to which he was exposed during that period of time.

As noted, the jury found that Keene's products were not unreasonably dangerous per se.

In their motion for JNOV, the plaintiffs argued that Keene failed to present any evidence to support the jury's finding that its products were not unreasonably dangerous per se, because the only evidence of utility related to time periods prior to Mr. Johnstone's exposure.

The district court's reasons for granting JNOV included: (1) the utility of fireproofing materials was not relevant to the utility-risk analysis, because there was no evidence that Mr. Johnstone was exposed to fireproof walls manufactured by Keene or its predecessors while sailing; (2) because Mr. Johnstone sailed on vessels containing Keene products from 1963 through 1978, the

benefits derived from the use of asbestos products to aid the war effort in the 1940s were irrelevant with respect to their utility during Mr. Johnstone's exposure in later years; (3) the use of the product to reduce heat in the engine room may possibly have outweighed the risk of the danger involved in its use only if there was a slight possibility that the insulation would be pulled apart, releasing fibers into the air, but the evidence showed that Mr. Johnstone was exposed to clouds of dust in performing his insulation repair duties. Considering the medical evidence of the grave dangers of asbestos and its ban by the Government, the magistrate judge concluded that "the inferences arising point strongly to a finding that the benefits flowing from Keene's product as used by Mr. Johnstone did not outweigh the potential risk of harm which the jury found Johnstone in fact suffered, the contraction of malignant mesothelioma which resulted in his death."

IV

We hold that the magistrate judge erred by disregarding a large portion of the evidence regarding the utility of Keene's products on the ground that such evidence was irrelevant. "A district court may not grant a judgment notwithstanding the verdict by disregarding evidence admitted at trial on the ground that the court erred by admitting the evidence." *Texas Commercial Business Systems, Inc. v. Federal Communications Corp.,* 898 F.2d 460, 461 & n. 1 (5th Cir.1990). "It [is] ... incumbent upon the trial court to consider all of the evidence before the jury, as it was in fact presented to the jury." *Id.* (quoting *Sumitomo Bank of California v. Product Promotions, Inc.,* 717 F.2d 215, 218 (5th Cir.1983)).

Moreover, we do not consider the MORROW CASTLE incident and the "asbestos won the war" evidence to be irrelevant in the applicable risk-utility analysis under Louisiana law. "*Halphen* requires that the danger in fact of the product to *society as a whole* be weighed against the utility of the product to *society as a whole*." *Valenti v. Surgiteck-Flash Medical Engineering Corp.,* 875 F.2d 466, 467 (5th Cir.1989). The utility of Keene's products in the war effort was relevant because the ships on which Mr. Johnstone was exposed to Keene's products were constructed during the early 1940s, and contained much of the original insulation. Such evidence also was relevant because Mr. Johnstone sailed on other vessels during the war years and was exposed to other asbestos-containing

products during that time. As the plaintiffs' own expert testified, the more asbestos a person is exposed to, the more likely that person is to contract mesothelioma. The MORROW CASTLE incident also was relevant to the utility of asbestos-containing insulation products during the time of Mr. Johnstone's exposure, because it precipitated the governmental regulations that required that asbestos insulation be used on the ships on which Mr. Johnstone sailed.

In setting aside the jury's verdict, the magistrate judge seems to have focused on the risks to Mr. Johnstone, as opposed to the risks to society as a whole. A product's risk "concerns not only the qualitative harmful effect, but also the quantitative harm or "incidence' of serious adverse effects, that is, the ratio of instances of harm compared to the total use or consumption of the product." *Williams v. Ciba-Geigy Corp.,* 686 F.Supp. 573, 579 (W.D.La.), *aff'd,* 864 F.2d 789 (5th Cir.1988). If the risks of a product were viewed only from the perspective of the injured plaintiff, most any product that caused a non-negligent injury would likely be found to be unreasonably dangerous per se.

It is true, of course, that the jury found that Mr. Johnstone's mesothelioma was caused by his exposure to Keene's products, which contained amosite asbestos. This finding, however, is not inconsistent with the jury's ultimate determination that Keene's products are not unreasonably dangerous per se. In concluding that Keene's products were not unreasonably dangerous per se, the jury did not confine its assessment of the risks of Keene's products to the risk actually realized by Mr. Johnstone, but instead correctly considered the risks of Keene's products to society as a whole. Keene, for example, introduced evidence that 90-957 of mesotheliomas are caused by crocidolite asbestos, which was not present in the products of Keene's predecessors. Although the evidence was conflicting on this point, the jury was entitled to choose which of the experts to believe. Based on this evidence, the jury was entitled to find that, even though Keene's products were a substantial contributing cause of Mr. Johnstone's mesothelioma, the overall utility of Keene's products nevertheless outweighed the risks of those products to society as a whole.

The magistrate judge also made much of the fact that asbestos was banned from commercial use in 1972, six years before Mr. Johnstone's exposure ended, and of the fact that an alternative means of heat insulation was available after 1972. However, there also was evidence that government

specifications required the use of asbestos insulation on the ships on which Mr. Johnstone was exposed to Keene's predecessors' products, that much of the original insulation was still on the ships during the time of Mr. Johnstone's exposure, and that "[i]t wouldn't make much sense to take out [the] original insulation."

Considering all of the evidence of the risks and utility of Keene's asbestos-containing insulation products to society as a whole, in a light most favorable to Keene, we conclude that it is of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions. Accordingly, the plaintiffs' motion for JNOV should have been denied. We therefore reverse the judgment.

V

Because we have determined that the JNOV must be reversed, we now turn to consider the plaintiffs' alternative motion for a new trial, which was based on a contention that the jury's verdict was against the great weight of the evidence. The magistrate judge, however, did not rule on the alternative new trial motion, as required by Fed.R.Civ.P. 50(c):

> If the motion for judgment notwithstanding the verdict ... is granted, the court *shall* also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and *shall* specify the grounds for granting or denying the motion for the new trial.

Fed.R.Civ.P. 50(c) (emphasis added).[4] Because the plaintiffs failed to obtain a ruling on their alternative motion for a new trial from the magistrate judge, and also failed to raise the issue on appeal, we hold that the plaintiffs have abandoned it. *See Oberman v. Dun & Bradstreet,* 507 F.2d 349, 353 (7th Cir.1974). Accordingly, judgment should be entered in accordance with the jury's verdict.[5]

VI

For the foregoing reasons, the judgment of the district court is REVERSED, and the case is

---

[4]The amended version of Rule 50(c) (which changes the name of a JNOV to "judgment as a matter of law") contains a similar requirement that the trial court rule on an alternative motion for new trial at the same time that it rules on a motion for judgment as a matter of law.

[5]Because we have reversed the JNOV and directed entry of judgment in accordance with the jury verdict, it is unnecessary for us to consider the set-off of settlement proceeds.

REMANDED for the entry of judgment in accordance with the jury's verdict.

REVERSED and REMANDED for ENTRY OF JUDGMENT.

JOHNSON, Circuit Judge, dissenting:

The jury in this case exonerated the Defendant because of the purported utility of the Defendant's asbestos-containing products. However, the evidence of utility presented by the Defendant was, as the magistrate judge correctly found, largely irrelevant and thus not sufficient to support a jury finding. Accordingly, the magistrate judge correctly granted the Plaintiff's motion for judgment notwithstanding the verdict. Unfortunately, the majority herein has been taken in by the same irrelevant evidence as was the jury and has voted to overturn the action of the magistrate judge. Therefore, I respectfully dissent.

DISCUSSION

It is overwhelmingly accepted now that exposure to asbestos particles is extremely hazardous, even in small quantities. Moreover, the jury in this case implicitly recognized this fact when it found that Mr. Johnstone's exposure to the asbestos in the Defendant's vessels was a substantial contributing cause to his death. Despite this recognized danger, though, the jury still found that the asbestos-containing products were not unreasonably dangerous per se.[1]

The basis for this finding is the second prong of the test laid out in *Halphen v. Johns-Manville Sales, Corp.,* 484 So.2d 110 (La.1986). Under that test, a product is "unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, *outweighs the utility of the product*." *Id.* at 114 (emphasis added). Defense lawyers convinced the jury that the utility of their asbestos-containing products was very great and thus it outweighed the recognized danger that the products presented.

However, most all the evidence that Keene presented on the issue of utility extolled the utility of the products a generation before Mr. Johnstone was exposed to the asbestos in Keene's vessels.

_____

[1]Under Louisiana law, this is a factual finding despite the misleading terminology. *Horton v. Buhrke, A Division of Klein Tools, Inc.,* 926 F.2d 456, 459 (5th Cir.1991).

Mr. Johnstone worked aboard Keene's vessels in 1964 and from 1967 through 1978. The thrust of Keene's utility evidence, though, consisted of patriotic ruminations about the critical role played by asbestos in the American victory in the Second World War.[2] Additionally, other evidence was introduced by Keene of the perceived utility of asbestos when the ships were built in the 1940s.

The extraordinary circumstances of the war years may well have heightened the utility of asbestos-containing products in that time period vis-a-vis their danger-in-fact. However, those circumstances did not pertain to the time-frame in which Mr. Johnstone was exposed some two to three decades later. Thus, this evidence was not relevant.

Instead, evidence as to utility must relate to the time of the use of the products by the plaintiff. This was recognized in *Halphen.* There, the Louisiana Supreme Court stated that

> the benefits are those actually found to flow from the use of the product, rather than as perceived at the time the product was designed and marketed. The fact that a risk or hazard related to the use of a product was not discoverable under existing technology or that the benefits appeared greater than they actually were are both irrelevant.

*Halphen,* 484 So.2d at 114. Here, all the evidence of the benefits of asbestos during the time of the war in the 1940s dealt with the perceived benefits at the time the vessels were built ("designed and marketed"). This evidence did not relate to the benefits that actually flowed from the products at the time Mr. Johnstone was exposed in 1964 and from 1967 through 1978.

Moreover, the jury was correctly instructed that the evidence of the utility had to pertain to the time that Mr. Johnstone was exposed. Specifically, the jury was instructed that

> the benefits are those actually found to flow from the use of the product at the time that Mr. Johnstone sustained an injury, rather than the benefits perceived at the time the product was designed and/or marketed.

Rec., Vol. 9, at 2011. Thus, as the 1940s evidence did not show the utility that flowed from the products at the time of Mr. Johnstone's exposure, it should not have been given weight in the jury's

---

[2]Also recounted by the majority is the evidence that asbestos is light-weight thus benefitting America when she was building warships under the constraints of the Washington Treaty of Limitations. Under that 1922 vintage treaty, there were limits on the maximum tonnage of warships and thus every pound saved meant that much more armor, guns and ammunition for a given displacement. Limitation of Naval Armament (Five-Power Treaty or Washington Treaty), Feb. 6, 1922, T.S. No. 671. While this is an interesting historical footnote, the Defendant's vessels were not warships and this treaty was no longer in effect at the time that Mr. Johnstone was exposed to the asbestos in the Defendant's vessels.

balancing of the risk versus utility.

The magistrate judge recognized this when she looked at the evidence. She found that the evidence on utility from the war years was insufficient to support a jury finding because it did not relate to the facts of the case. Next, she looked at the evidence of utility which did relate to the case, namely the evidence of the heat insulation properties of the asbestos. Balanced against this was the substantial evidence of the risk of harm and the evidence that Mr. Johnstone was exposed to clouds of asbestos dust. Given the paucity of relevant evidence as to the utility versus the clear evidence of risk of harm, she concluded that no reasonable jury could find that the utility of this product outweighed the strong evidence of risk of harm. Thus, she granted Mr. Johnstone's Motion for JNOV.

The standard by which we review a grant of a JNOV is set out in *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (*en banc* ). Under that standard, the Court must consider all evidence in a light most favorable to the nonmovant's case. "If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper." *Id.,* at 374. Moreover, a mere scintilla of evidence is not enough to support a jury issue, but rather, there must be substantial evidence to support a jury question. *Landry v. The Cooper/T. Smith Stevedoring Co.,* 880 F.2d 846, 850 (5th Cir.1989).

In finding that the magistrate judge's actions did not comport with the above standard, the majority makes several arguments. First, the majority contends that the magistrate judge erred by disregarding the evidence adduced of the utility of the products during the war years. This argument is grounded on the case of *Texas Commercial Business Systems, Inc. v. Federal Communications Corp.,* 898 F.2d 460 (5th Cir.1990). That case held that "[a] district court may not grant a judgment notwithstanding the verdict by disregarding evidence admitted at trial on the ground that the court erred by admitting the evidence." *Id.,* at 461. However, despite this pronouncement, the *Texas Commercial* Court went on to affirm the district court's granting of a JNOV in that case. This is because even though the expert testimony that was improperly admitted could not be disregarded,

it was still insufficient to support the jury's verdict because it did not relate to the facts of the case. *Id.,* at 462; *See also, Genmoora Corp. v. Moore Business Forms, Inc.,* 939 F.2d 1149, 1157 (5th Cir.1991).

The magistrate judge here followed the *Texas Commercial* case exactly. She did not disregard the evidence of utility from the 1940s. To the contrary, in her Order and Reasons explaining her decision, she carefully laid out the substance of all of that evidence. Then she found, as did the Fifth Circuit in *Texas Commercial,* that that evidence did not relate to the facts of the case and thus was insufficient to support the jury's finding. Thus, she granted the JNOV. There was nothing improper in this methodology.

Next, the majority argues that there is substantial evidence of utility because the anachronistic evidence from the war years is indeed relevant. The majority attempts to support its contention by pointing out that "*Halphen* requires that the danger in fact of the product to *society as a whole* be weighed against the utility of the product to *society as a whole.*" Slip op. at 1227 (*citing Valenti v. Surgiteck-Flash Medical Eng. Corp.,* 875 F.2d 466, 467 (5th Cir.1989)). While this is undoubtedly true, this writer fails to see how this supports the majority's conclusion. Surely the "society as a whole" refers to the society as it existed at the time of the plaintiff's injuries and not to society as it existed at some unspecified time in the past.

The majority further argues that this evidence was relevant because Mr. Johnstone sailed on other vessels during the war years and thus was exposed to other asbestos-containing products during that time. That may be, but the issue here is whether exposure to Keene's asbestos-containing products, which occurred in 1964 and from 1967 to 1978, legally caused Mr. Johnstone's death. The jury answered this question affirmatively. There may be other legal causes, but this does not affect Keene's liability to Mr. Johnstone.[3] Moreover, Keene cannot borrow the defenses that other possible defendants, on whose vessels Mr. Johnstone sailed in the 1940s, might be able to press.

The majority's final argument that some of the anachronistic evidence is relevant concerns the

---

[3]*See* Restatement (Second) of Torts § 875 (1979) ("Each of two or more persons whose conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm").

MORROW CASTLE incident in 1938. In this maritime tragedy, a large passenger ship caught fire off the coast of New Jersey and caused the death of over 1000 people. This led to governmental regulations that required asbestos to be used in vessels in firewalls, bulkheads and ceiling materials.

Though this fireproofing material is similar in composition, it is a different product from the pipe covering insulation that was the cause of Mr. Johnstone's injuries. There was no evidence presented that Mr. Johnstone was exposed to fireproofed walls for which Keene was responsible. Moreover, the tendency of fireproof walls to release asbestos fibers may be substantially different from that of the pipe insulation. In normal circumstances, the fireproofed walls are under no particular stress. By contrast, the pipe covering insulation protects steampipes in the engine room that are routinely superheated. Thus, the relevance of the utility of asbestos firewalls, whose use was mandated after the tragic MORROW CASTLE disaster, is not relevant to the risk/utility assessment of asbestos-containing pipe insulation.

The majority concludes by opining that in finding that the evidence from the 1940s does not relate to the facts of the case, the magistrate judge erroneously limited her consideration of the risks and utility attendant to the use of this product to the risks to Mr. Johnstone individually, as opposed to the risks to society as a whole. This is simply not accurate. The magistrate judge considered society as a whole, but it was the society that existed when Mr. Johnstone was exposed and not the society of a generation earlier.

CONCLUSION

The expert testimony of the utility of the asbestos-containing products during the war years did not relate to the facts of the case. *See Texas Commercial,* 898 F.2d at 462. Besides this evidence, there was very little presented on the issue of utility. There was, however, substantial evidence of the potential risk of harm from these asbestos-containing products. In fact, the jury implicitly recognized that these products caused at least some risk of harm to society when it found that Mr. Johnstone's exposure to them substantially contributed to his death. Balancing the relevant evidence of utility against the evidence of potential risk of harm, the magistrate judge found that, even viewing the evidence in a light most favorable to Keene, no reasonable jury could conclude that the

utility of these asbestos-containing products outweighed their potential risk of harm. This assessment was correct and thus it was altogether proper for the magistrate judge to grant the Motion for JNOV. *See Boeing,* 411 F.2d at 374.

Nonetheless, the majority reverses the magistrate judge's actions by erroneously focusing on the perceived benefits of the products at the time the vessels were built as opposed to the actual benefits that flowed at the time Mr. Johnstone was injured. *See Halphen,* 484 So.2d at 114. These benefits pertained to an era far removed by time and circumstance from the time-frame in which Mr. Johnstone was exposed. They do not, however, relate to the facts of this case. Accordingly, this dissent is respectfully submitted.