628 So.2d 1213 (1993)
Bruce MARTIN, Plaintiff-Appellee,
v.
LOUISIANA FARM BUREAU CASUALTY INSURANCE COMPANY, et al., Defendants-Appellants.
No. 93-223.
Court of Appeal of Louisiana, Third Circuit.
December 8, 1993.
Louis D. Bufkin, Lake Charles, for Bruce Martin.
Raymond C. Jackson, III, Lafayette, for Golden Rule Ins. Co.
Before DOMENGEAUX, LABORDE and COOKS, JJ.
COOKS, Judge.
Bruce Martin filed a tort action claiming damages for injuries sustained during an automobile *1214 accident against various defendants. Golden Rule Insurance Company, Martin's insurer, intervened in the suit seeking reimbursement for medical expenses paid as a result of injuries Martin sustained in the accident. The insurer based its claim for recovery on the theory of legal subrogation. Responding, Martin filed an exception of no cause of action. Subsequently, the trial judge granted the exception dismissing the insurer's action. This appeal by Golden Rule Insurance Company followed. The single issue presented is whether a health insurer acquires, by operation of law, the right of legal subrogation to the claim of its insured against a tortfeasor for payment of medical expenses. Answering this query in the negative, we affirm the trial court's ruling on the exception.

LAW AND ANALYSIS
Although a person pays another's debt, that person does not acquire automatically the right to step in the "shoes" of the creditor and thereby insist that the debtor reimburse him for satisfying the debt, unless such right is acquired by conventional or legal subrogation. The Louisiana Civil Code provides subrogation takes place only by written contract executed between the parties or by operation of law under certain limited conditions. Here, the insurer acknowledges its claimed right of subrogation was not acquired conventionally. Martin did not grant by express agreement, in writing, the insurer the right to assert his claim for medical expenses against the tortfeasor. See Louisiana Civil Code article 1828. In practice, insurance contracts usually contain clauses providing for conventional subrogation of the insurers to the rights of the victims against the tortfeasors. The parties were not prohibited by law from entering such agreement, through "fair market" negotiations. In this case, however, the insurer argues subrogation took place by operation of law as provided in Louisiana Civil Code article 1829. Article 1829 provides that subrogation, absent conventional reservation, takes place "in favor of an obligor who pays a debt he owes with others and for others and who has recourse against those others as a result of the payments." Louisiana Civil Code article 1829(3). The Louisiana subrogation articles, though amended in 1984, substantially tract their predecessor articles enacted in 1870. The language used in the referenced section is almost identical in all respects to the expressions contained in the original 1870 codal provision. See Louisiana Civil Code article 2161(3).
Much confusion has surfaced recently in the jurisprudence as courts have revisited the question of when an insurer is legally subrogated to the rights of an insured against a wrongdoer after paying a covered claim pursuant to the terms of an insurance contract. Prior Louisiana jurisprudence answered this question in the negative. The earliest reported decision finding legal subrogation does not take place in favor of an insurer is D.R. Carroll & Co. v. New Orleans, J & G.N.R.R. Co., 26 La.Ann. 447 (1874), in which the court said:
"There was no contract between [the insurer and the railroad]; consequently there was no conventional subrogation from the insured to the assurers, and there was certainly no legal subrogation by which payment by the one entitled them to payment from the other. The insurance company paid the loss for which they received a premium for insuring against to the persons who suffered the same. As there was no contract between it and the railroad company, and as no obligation existed toward them from the railroad company, they have no claim against it."
But, in London Guarantee & Accident Insurance Co. v. Vicksburg, S. & P.R. Co., 153 La. 287, 95 So. 771 (1923), the Supreme Court recognized a workmen's compensation carrier's right to seek reimbursement for benefits paid to an injured worker against the defendant railroad. At that time, the language of the compensation Act granted subrogation rights to the employer. The Act, however, was silent on the right of the employer's insurer to proceed against the *1215 wrongdoer. The court found, nevertheless, Louisiana Civil Code article 2315 granted the insurer the right to proceed against the wrongdoer whose fault caused the insurer damage by requiring it to pay benefits to the injured worker. Legislative amendment to the Act now recognizes the right of the insurer to directly assert a claim against a tortfeasor. The case, however, did not represent a departure from the court's earlier holding in D.R. Carroll & Co. It did not reach the question of whether the counterpart to article 1829(3) granted the compensation carrier legal subrogation rights. Later, affirming its holding in D.R. Carroll & Co., the Supreme Court again specifically rejected a claim by the insurer against a tortfeasor grounded solely on the theory of legal subrogation, stating in Forcum-James Co., Inc. v. Duke Transportation Co., 231 La. 953, 93 So.2d 228 (1957):
"It is a basic principle of the law that a tortfeasor is responsible only for the direct and proximate result of his acts and that, where a third person suffers damage by reason of a contractual obligation to the injured party, such damage is too remote and indirect to become the subject of a direct action ex delicto, in the absence of subrogation. See Foret v. Board of Levee Com'rs of Orleans Levee Dist., 169 La. 427, 125 So. 437, citing, among other authorities, Sutherland on Damages, Vol. I, p. 127. And see also D.R. Carroll & Co. v. New Orleans, J. & G.N.R. Co., 26 La.Ann. 447. This appears to be the general rule, to which the Supreme Court of the United States has given its stamp of approval. Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, [309] 48 S.Ct. 134, 135, 72 L.Ed. 290. In that case, Justice Holmes remarked that `* * * no authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other, unknown to the doer of the wrong. * * * The law does not spread its protection so far.'
Even the broad language used in Article 2315 of our Code2 does not justify a departure from the above stated doctrine.3 Indeed, to permit a person to proceed against a wrongdoer in every instance where such person has sustained damage by reason of his contractual obligation to the injured party would open the door to the prosecution of claims for damages indirectly and remotely connected with the tortious act and encourage a multiplicity of suits from which numerous conflicts of interest might ensue. Parties situated in plaintiff's position can readily protect themselves by obtaining from the injured person a conventional subrogation of the latter's rights and, thus, the tort-feasor can be made to respond for the direct and foreseeable consequences of his act in a single unit." (Emphasis added).
Citing this decision, Louisiana courts continued to reject attempts by insurers to expand the theory of legal subrogation embodied in Louisiana Civil Code article 2161(3) [now article 1829(3)] to include claims against tortfeasors for payments made to the insured.[1] Relying on Forcum-James, this court also rejected the insurers "alleged right" to proceed by legal subrogation against the wrongdoer for medical expenses paid to the insurer. Harris v. Huval Baking Co., 265 So.2d 783 (La.App. 3d Cir.1972), cert denied, 263 La. 103, 267 So.2d 210 (1972). See also Courtney v. Harris, 355 So.2d 1039 (La. 4th Cir.1978) and American Indemnity Co. v. New York Fire & Marine Underwriters, Inc., 196 So.2d 592 (La.App. 1st Cir. *1216 1967). To the settled stream of cases adopting the holdings in D.R. Carroll & Co. and Forcum-James which flowed without significant interruption for nearly a century, the Supreme Court in Pringle-Associated Mortgage Corp. v. Eanes, 254 La. 705, 226 So.2d 502 (1969), further interpreting the language of article 2161(3), reasoned that the article also "presupposes the existence of a solidary obligation."[2] Thus, adding to the long line of cases consistently holding article 2161(3) did not grant a right of legal subrogation to insurers in tort cases, the Supreme Court stated in Pringle "if no solidary obligation exists, [legal] subrogation does not take place." Continuing to cite D.R. Carroll & Co. and Forcum-James, several later cases also cited Pringle as an ultimate bar to insurers' claims in tort cases, based strictly on legal subrogation grounds, finding an absence of solidarity between the insurer and wrongdoer. Harris v. Huval Baking Co., supra.
One year after adopting the Forcum-James and Pringle holdings in Huval Baking Co., supra, this court in Hartford Accident & Indemnity Company v. Byles, 280 So.2d 624 (La.App. 3d Cir.1973) was called again to visit the question of the insurer's right to seek recovery from the tortfeasor of payments made to the insured. For the first time in Hartford, we squarely addressed the applicability of article 2161(3) in a case involving an insurer's claim that it was legally subrogated to the rights of the insured against an uninsured motorist. We held "the insurer who is bound under its contract of insurance for payment of the loss or damages caused by a third party, and who is forced to pay under that contract as the result of the negligence of that party, is legally subrogated under LSA-C.C. article 2161 to the rights of its insured against the third party tortfeasor to the extent of the payment which it was required to make." Likening the position of an insurer under such circumstances to that of a surety, we sought guidance by analogy from well settled surety law and ultimately concluded the insurer's liability to its insured in that case was conditioned on a determination of negligence which bound the insurer "with or for the third party tortfeasor" for the payment of the damages. However, expressly distinguishing and reaffirming in passing the Huval decision, we noted:
"... the insurer in the Harris case was not bound with or for the third party tortfeasor for the hospital and medical expenses incurred by Harris. It was bound under its contract to pay hospital, medical and surgical benefits to its insured, whether anyone else might or might not also owe them. The obligation of the insurer was not conditioned on the negligence or the liability of a third person, and the insurer thus was not bound with or for anyone else for the payment of those expenses."
Adopting this court's decision in Hartford Accident and Indemnity Company v. Byles, supra, other courts also allowed insurers to proceed by legal subrogation in property loss cases. See for example Volume Shoe Corp. v. Armato, 341 So.2d 611 (La.App. 2d Cir. 1977); Sentry Indemnity Co. v. Rester, 430 So.2d 1159 (La.App. 1st Cir.1983). The Fourth Circuit Court of Appeal, in Courtney v. Harris, 355 So.2d 1039 (La.App. 4th Cir. 1978), later adopted our Huval decision dismissing a similar claim by a health insurer. Without exception, the jurisprudence remained consistent in rejecting all attempts by insurers to recoup medical benefits paid pursuant the terms of health policies in tort *1217 cases by mere reliance on the theory of legal subrogation.
In 1979 law professor H. Alston Johnson, III, published an article entitled Legal Subrogation of Insurer to Insured's Right Upon Payment of Claim.[3] Strongly criticizing the Courtney decision, Professor Johnson, while "tippy toeing" through prior case law, noted what he typed is a "jurisprudential dichotomy" in the courts interpretation of article 2161(3). He blamed this so-called "dichotomy" chiefly on the earlier cases which followed London Guarantee & Accident Insurance Co., supra, in recognizing a cause of action under article 2315 in favor of insurers who paid certain property and collision loss claims. Aetna Cas. & Sur. Co. v. Allen, 132 So.2d 240 (La.App. 3d Cir.1961); John M. Walton, Inc., v. McManus, 67 So.2d 130 (La. App. 1st Cir.1953). While pointing out courts in three later cases "permitted legal subrogation for insurer having made payments under uninsured motorist, property or collision coverage" using article 2161(3) but disallowed similar claims for medical expenses relying on Forcum-James and Pringle, he suggested "the announced distinction between the two lines of jurisprudence [was] that the insurers having paid medical expenses are bound without regard to the fault of anyone else, but those having paid uninsured motorist claims or collision claims are bound `with' the wrongdoer." He then dismissed the courts' reasoning, in both lines of jurisprudence, as an engagement in semantics rather than substance.
Further, he criticized the Pringle decision for adding to the "dichotomy" by holding the obligation shared by the insurer and the wrongdoer must be solidary. Professor Johnson finally concluded by postulating the source of the insurer's rights, including claims for medical payments, "ought to be article 2161(3)," which he argued "merely requires the insurer show it was `bound with others, or for others' for the amount which it paid to the insured." Posing a purely hypothetical set of facts, he encouraged the reader to:
"Suppose that the issue is medical payments under an automobile policy. Due to the occurrence of the insured risk (injury to insured through use or operation of vehicle), the insurer is obligated (by `contract') to pay certain medical expenses, up to a designated amount. If it is proven that a third person (the defendant) is at fault in the occurrence of the insured risk, then he is obligated to pay those same expenses (by `tort'). Thus, the insurer is `bound with' the wrongdoer for these expenses and is entitled to legal subrogation from the insured to collect them from the wrongdoer. The relationship of the insurer and the wrongdoer, as between themselves, is not governed by the fact that they are `bound together,' necessitating a conclusion that they must share the loss. Both the jurisprudence28 and the Civil Code29 recognize that, even between persons bound together to a third person for the same debt, indemnity rather than contribution may be the rule. Thus the insurer is entitled to collect the full amount of its loss from the wrongdoer."
Near the end of this imaginary excursion, he suggested a "ruling" which he reasoned "achieves a salutary policy" because:
"The wrongdoer is required eventually to pay the full amount of damage, just as he would if no insurance were in the picture. Certainly he cannot complain that he has not been accorded a reduction in damages which he caused. The victim theoretically receives, from the wrongdoer and from his own insurer, the full amount of his damages. The insurer is reimbursed for a loss caused by the fault of the wrongdoer and will theoretically reflect this success in the calculation of premiums. Although the insured pays for this coverage, the rate structure ought to reflect the record of success of the insurer in casting this loss back on the wrongdoer when possible; and the insured has, for his premium, received two important values: certainty and promptness of recovery, though of limited amounts.

*1218 To refuse to reach this conclusion, in the instance in which no conventional subrogation has taken place, is to cast this loss (on what a layman, and perhaps even a heretical lawyer, might term a `technicality') on the insured class, which would have to be reflected in even higher premiums on these types of insurance."
In Wheelahan v. Eller, 446 So.2d 442 (La. App. 4th Cir.1984), writ denied, 447 So.2d 1073 (La.1984) citing the trilogy of cases which applied article 2161(3) and recognized the claims of insurers for recovery of property and uninsured motorist coverage payments made to insured in tort cases,[4] the insurer argued the jurisprudence and certain policy considerations mentioned in Professor Johnson's publication compelled reversal of the cases which continued to deny such subrogation rights to health insurers. Rejecting the insurers position, the Wheelahan court determined all the cited cases were distinguishable and noted this court expressing an obvious intention to limit the sweeping effects of Hartford Accident & Indemnity Co. v. Byles, supra, cautiously said:
"[The] insurer was not legally subrogated to the rights of the insured insofar as the medical payments were concerned. In [American Indemnity] as in Harris v. Huval Baking Co., supra, the medical payments were owned by the insured regardless of liability on the part of anyone else, and the insurer thus was not bound with or for any other person for those payments. Article 2161 of the Civil Code did not apply, and the insurer thus was not entitled to a legal subrogation to the rights of its insured under that article."
Also, unpersuaded by the "lowering of premium" public policy consideration advanced in Professor Johnson's article, the Wheelahan court noted "that academic supposition presupposes numerous variable factors." Even more troublesome, the court stated:
"In a case involving comparative negligence, subrogation could be for less than the insurance recovery, or the tortfeasor might be forced to pay the total loss even though the comparative fault was disproportionate. Query: adopting intervenor's position, is a life insurer legally subrogated for death benefits against a tortfeasor?"
Two years later, in Aetna Insurance Company v. Naquin, 488 So.2d 950 (La.1986), the Supreme Court allowed a property insurer's claim against a negligent contractor for reimbursement of funds paid to tenants on behalf of the insured landlord. In doing so, the court typed as "obiter dictum" the statement in Pringle interpreting article 2161(3) as presupposing the existence of a solidary obligation. Ultimately finding the absence of "solidarity" will not defeat an insurer's subrogation claim under article 2161(3), the court rested the decision almost entirely on the policy considerations advanced in Professor Johnson's article stating:
"There are several compelling reasons put forward by Professor Johnson which lead to the conclusion that legal subrogation is the more desirable and legally cohesive rule. First and foremost are the promptness and certainty of recovery guaranteed the victim. The victim will receive from the wrongdoer and his insurer the full amount of his damages. He will also receive this payment quickly from his insurer, especially if the insurer knows it will later be able to recover from the wrongdoer. If the insurer is able to be reimbursed for a loss caused by another's fault, this success will be reflected in lower premiums. Although the insured is paying for this quick and prompt coverage, the premium he pays ought to reflect the record of success of the insurer in casting this loss back on the wrongdoer when possible. To refuse to give the insurer a right to subrogation is to cast the loss on the insured class, rather than the person by whose fault the loss occurred. This undoubtedly has the effect of higher premiums *1219 on these type of insurance. Neither can the wrongdoer complain that he has not been accorded a reduction in the damages which he has caused. Society has an interest in requiring the wrongdoer to pay the full amount of damage he has caused if he is able.
* * * * * *
Subrogation is also consistent with Louisiana law concerning collateral sources. The `collateral sources' doctrine serves to prevent the defendant from receiving a windfall because the victim has chosen to provide, by contract, other sources of redress for injury. We do not permit this credit for the defendant because of the recognition that he is in fact liable for the harms so paid for by others. To the extent that others properly present their claims they should be reimbursed."
At last, reaching for "some" authority other than "judicial policy making" to support the Aetna decision, the court pointed to the official comments to article 1829(3) which states "an obligor is bound `with' another under this article regardless of whether his obligation arises from the same act as the obligation of the other or from a different act." Accepting this statement as valid "authority" for departing from its holdings in Pringle, the court concluded the comment "resulted from many long hours of research and study by the reporters" and as such presumably it should take precedent over this State's prior jurisprudence which also resulted from countless hours of research and contained the combined wisdom of the bench. Without much more, the court concludes "granting subrogation to insurers is completely compatible with the whole of Louisiana law."
Notably, the reporters cited only one case as authority for making the "blanket" statement contained in the official comments referenced by the court and that case was decided in 1880. In Gay & Co. v. Blanchard, 32 La.Ann. 497, Mrs. Suthon purchased half of a plantation for $10,000, represented by four notes due one each succeeding year, secured by mortgage and vendor's lien. During the year the first note became due, Mrs. Suthon sold the property to F.W. Pike who assumed payment of the notes and granted a separate mortgage in favor of Mrs. Suthon to secure his faithful payment of the indebtedness. Well, as luck foretold, Pike defaulted on the notes and the holder of the mortgage ultimately instituted foreclosure proceedings against Mrs. Suthon who asserted multiple defenses to the suit. Plowing through her contentions, the court simply recognized that on eventual payment of the original indebtedness (later assumed by Pike), Mrs. Suthon was entitled to full subrogation of "all rights" the creditor had against Pike as well as the mortgage rights she independently possessed against him because she was bound "with" him for the debt. The court reasoned:
"Solidarity may be perfect or imperfect. It is perfect, and the obligors are the mandataries of each other, when by the same act, at the same time, they bind themselves to the performance of the same thing. It is imperfect (and they are not mandataries of each other) when they bind themselves to the same thing by different acts or at different times. See Marcade', volume 4, p. 509; also [Jacobs v. Williams' 12 R. 183; [McCalop v. Newcomb] 2 Ann. 332; [Corning v. Wood] 15 An. 168."
In contrast with the Aetna decision, the Gay court relied on this passage and found while Mrs. Suthon was not an insolido co-obligor with Pike on the original notes, she nevertheless was "solidarily" obligated "with him" for same indebtedness, though their obligations were perfected in different instruments.
Surely, Professor Johnson, whose scholarship in law is well renowned,[5] must have discovered while studying article *1220 2161(3) that it is virtually identical to the corresponding article in the French Civil Code having its origin in Roman Law. Joined by other courts in the past, the Supreme Court has said comments of French authors interpreting articles adopted from the French Civil Code, though not absolutely binding, are entitled to great persuasive weight. Orleans Parish Sch. Bd. v. Pittman Construction Co., 261 La. 665, 260 So.2d 661 (1972); Rials v. Davis, 212 La. 161, 31 So.2d 726 (La.1947). The "solidarity" principle articulated in Pringle and adopted in later cases is supported by all the major French authorities.[6] See 2 Aubry and Rau, Obligation, § 321 (English translation by the Louisiana State Law Institute, 1965)); 2 Planiol Civil Law Treatise (English Translation by the Louisiana State Law Institute, 1959); Duranton, XII, 176; Toullier, VII, 149 ff. [See as an application: Cass., Jan. 9, 1899, Sir., 1899.1 309; D.P. 1899.1 297, Note by T.P.]. In making this observation, we do not suggest that this court should ignore the holding of the Supreme Court in Aetna. Louisiana's judicial scheme, in part established by custom and deference between the levels of the judiciary, requires us to apply the last expressions of the highest court of this State.
Citing the Aetna decision, the insurer in this case argues our decision in Huval is "fatally" flawed and demands reversal because we in part relied on the Pringle decision. We do not share the insurer's belief that the Supreme Court in Aetna impliedly overruled Huval and the well reasoned cases which followed. Our opinion, in this regard, is buttressed by the recognition that the Huval and Wheelahan decisions did not hinge solely on the soundness of the Pringle holding thus discussed. While the Pringle case is certainly mentioned in Huval, we also relied on the Supreme Court's decision in Forcum-James and noted with approval the court's recognition that certain intervenors "can readily protect themselves by obtaining from the injured person a conventional subrogation of the latter's right and, thus, the tort-feasor can be made to respond for the direct and foreseeable consequences of his act in a single suit." See Marquette Casualty Company v. Brown, 235 La. 245, 103 So.2d 269 (1958); and American Indemnity Co. v. New York Fire & Marine Underwriters, Inc., 196 So.2d 592 (La.App. 1st Cir.1967). The Forcum-James decision did not turn on the presence or absence of "solidarity" between the parties. Rather, it too reflected a public policy recognition that in certain matters the law should not spread its protection so far and "open the door to the prosecution of claims for damages indirectly and remotely connected with the tortious act and encourage a multiplicity of suits from which numerous conflicts of interest might ensue." For more than thirty years, the courts of this State have cited with approval the referenced passages appearing in the Forcum-James case in rejecting persistent attempts by health insurers to bypass the conventional method well recognized in our subrogation law for protecting their "alleged" right to recoup medical expenses paid as a consequence of tortious injuries. We do not believe the time has come for us to abandon such jurisprudence and to usurp the people's ultimate authority, through the collective wisdom of our state legislators, to regulate and protect the public's interest by establishing a scheme for assuring the realization of the "salutary" benefits mentioned in Professor Johnson's article. Through our research, we have discovered as well, that in the cases where health insurers have sought such subrogation relief predicated upon common-law or equitable principles, they also have not been successful. Medical Insurer's Right of Subrogation, 73 ALR 3d 1140 § 3, p. 1147. Not a single court in the United States of America, at least in any reported case, has adopted the position advanced by the insurer in this case and we decline to stand alone.
Moreover, unlike property and certain other casualty policies, health insurance payments generally are contingent on assumption by the insured of certain annual "deductible" *1221 medical expenses for each family member and provide for maximum benefit payments which are often "substantially" less than the total cost actually incurred by the insured.[7] Also unique to health insurance contracts is that the obligation to pay benefits usually arises without regard to the "etiology" of a particular medical condition. As suggested in Wheelahan, if we adopt the health insurer's position is it not also an exercise in "semantics" to deny a life insurer the right of legal subrogation for death benefits against a tortfeasor? Our holding in this case likewise serves a "salutary policy" by recognizing the rights of insureds to fairly negotiate the terms of insurance contracts in a competitive market[8] and this State's legislative power to protect the public's economic interest in lowering the cost of health insurance without opening the "floodgate" to litigation.[9]
In closing, we note the cases cited by the insurer in further support of its position, rendered after the Aetna decision, did not squarely address the question of whether a health insurer is legally subrogated to the rights of its insured in tort cases; and, therefore, they are not dispositive in this case.[10]
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed against appellant.
AFFIRMED.
DOMENGEAUX, C.J., concurs.
NOTES
[1] Such claims were rejected except for insurers having made payments under property or collision coverage and who relied on article 2315 in establishing their claim first recognized by the Supreme Court in London Guarantee & Accident Insurance Co. v. Vicksburg S & P.R. Co., supra. Aetna Cas. & Sur. Co. v. Allen, 132 So.2d 240 (La.App. 3d Cir.1961) (property); John M. Walton, Inc., v. McManus, 67 So.2d 130 (La.App. 1st Cir.1953) (collision loss). Desormeaux v. Central Indus., Inc., 333 So.2d 431 (La.App. 3d Cir. 1976), cert. denied, 337 So.2d 225 (La.1976); Baughman Surgical Assoc., Ltd. v. Aetna Cas. & Sur. Co., 302 So.2d 316 (La.App. 1st Cir.1974); Messina v. Sheraton Corp. 291 So.2d 829 (La. App. 4th Cir.1974).
[2] The only case which seemingly departed from this steady stream is a 1932 decision rendered by the Supreme Court in Tilly v. Bauman, 174 La. 71, 139 So. 762. Interestingly, the Supreme Court in Pringle refused to follow Tilly and noted "that decision [stood] alone in the jurisprudence and [had] been criticized as a `strained' construction of the pertinent statutes," citing Steeg and Meyer, "When is a Security Not a Secured Right?" 39 Tul.L.Rev. 513, 516. Even more noteworthy was the court's expression that "the decision [was] unsound and must yield to the legislative will embodied in the statutes and code articles." As noted by Steeg and Meyer, Tilly v. Bauman was a depression era decision rendered by the court obviously influenced by the clash of "economic interests" at the time. Id.; Pringle-Associated Mortgage Corporation v. Eanes, supra, 226 So.2d at 516.
[3] 39 Louisiana Law Review 675.
[4] Volume Shoe Corp. v. Armato, 341 So.2d 611 (La.App. 2d Cir.1977) (hazard insurer); Hartford Accident & Indemnity Company v. Byles, 280 So.2d 624 (La.App. 3d Cir.1973) (Uninsured motorist insurer) and Sentry Indemnity Co. v. Rester, 430 So.2d 1159 (La.App. 1st Cir.1983) (casualty/fire insurer).
[5] The author benefitted greatly from Professor Johnson's brilliance and uncommon aptitude for digesting and understanding the law as one of his former students. She shares with many who have had the pleasure of reading his works on various legal topics immense respect for his professional abilities and scholarship.
[6] Interpreting article 2161(3), the French commentators agreed that legal subrogation did "not take place in favor of a simple conjoint debtor of a divisible obligation." 2 Aubry and Rau, Obligation, § 321, p. 202 (English Translation by the Louisiana State Law Institute, 1965).
[7] Such policies routinely exclude coverage for cosmetic restorations, home nursing care, pre-existing medical conditions (which may be aggravated by tortious occurrences), and limit the kind of hospital accommodations an insured may select, as well as requiring pre-approval of physicians and recommended courses of treatment.
[8] Is it not in keeping with sound public policy to allow those who acquire group policies in particular, often in part funded by employers, to insist that carriers in the insurance contracts bind themselves in writing to adjust premium cost by factoring in the sums recovered from third party tortfeasors within a definite period of time? Why should we judicially meddle in such fair market dealings between the parties?
[9] The rising cost of healthcare and insurance premiums are also the subjects of much national debate which have garnered the attention of both Congress and the President of the United States. Is it not preferable to await the "reforms" which may spawn from this discourse, rather than drastically changing our settled jurisprudential course in an area of law which already provides adequate subrogation protection to the insurer?
[10] Appellant cited Johnson v. Deselle, 596 So.2d 261 (La.App. 3d Cir.1992), writ denied, 600 So.2d 638 (La.1992) and Hellmers v. Dept. of Transp. & Development, 503 So.2d 174 (La.App. 4th Cir. 1987).