Louella COATES, et al.

v.

AC AND S, INC., et al.

Civ. A. No. 90–1448.

United States District Court,
E.D. Louisiana.

Jan. 14, 1994.

Louis Leo Robein, Jr., Robert H. Urann, Magdalen C. Blessey, Gardner, Robein & Urann, Metairie, LA, for plaintiff.

Michael T. Cali, Darryl J. Foster, Lemle & Kelleher, New Orleans, LA, for Owens–Corning Fiberglass Corp.

Maria I. O'Byrne Stephenson, Marie I. Patino–Caro, Catherine Chavarri, Lisa C. Matthews, New Orleans, LA, for Rockwool Mfg. Co.

Richard L. Forman, Walter G. Watkins, Jr., Fred Krutz, III, Ronald D. Collins, Daniel J. Mulholland, Curtis E. Presley, III, John D. Cosmich, Forman, Perry, Watkins & Krutz, Jackson, MS, for Owens–Illinois, Inc., Keene Corp.

Francis P. Accardo, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, LA, for Celotex Corp.

Forrest Ren Wilkes, Thomas L. Kirkland, Jr., David A. Barfield, Peggy C. Newton, Kirkland, Barfield & Panter, Jackson, MS, for AC & S, Inc.

Geoffrey P. Snodgrass, J. Warren Gardner, Jr., Christovich & Kearney, New Orleans, LA, for AC & S, Inc.

Anthony J. Staines, Kaye N. Courington, Ellefson, Pulver & Staines, Metairie, LA, for Eagle–Picher Industries, Inc.

Robert E. Kerrigan, Jr., A. Wendel Stout, III, Ethel H. Cohen, Marc J. Yellin, Barbara L. Arras, Jante L. MacDonell, Jude D. Bourque, Ronald L. Courtade, Jr., Deutsch, Kerrigan & Stiles, New Orleans, LA, for Armstrong World Industries, Inc., GAF Corp., Turner & Newall, PLC.

Thomas M. Bergstedt, Bergstedt & Mount, Lake Charles, LA, for H.K. Porter Co., Inc.

Grey Redditt, Jr., McCarfferty & Reddit, Mobile, AL, for H.K. Porter Co., Inc.

James S. Thompson, Pamela A. Schmitt, Porteous, Hainkel, Johnson & Sarpy, New Orleans, LA, for Fibreboard Corp., Pittsburgh Corning Corp.

James H. Powers, Sharla J. Frost, Roberts, Markel, Folger & Powers, Houston, TX, for Fibreboard Corp.

Jesse R. Adams, Jr., Adams & Johnston, New Orleans, LA, for Manville Corp. Asbestos Disease Fund.

Dominic J. Ovella, John T. Culotta, Hailey, McNamara, Hall, Larmann & Papale, Metairie, LA, for Flintkote Co.

CHARLES SCHWARTZ, Jr., District Judge.

Before the Court are the following pre-trial Motions/Memoranda filed by the parties in the captioned proceedings:

1. Plaintiffs' and Defendant Owens–Corning Fiberglass Corporation's (OCF's) and Rock Wool Manufacturing Company's (Rock Wool's) Pre-trial Memoranda regarding the law applicable to apportionment of liability.
2. Plaintiffs' motion for an order that asbestos-containing products are unreasonably dangerous *per se* as a matter of law;
3. Plaintiffs' motion to admit OSHA and EPA publications;
4. Defendant OCF's motion to exclude evidence of medical expenses paid by third parties;
5. Defendant OCF's motion to exclude evidence of mental anguish;
6. Defendant OCF's motion for reverse bifurcation of the trial.

The Court, having reviewed the submissions of the parties and having determined that there is no necessity for an oral hearing regarding the aforesaid issues, deems the matters submitted on the briefs and addresses the issues herein below.

I. BACKGROUND

Plaintiffs herein filed a wrongful death action, claiming that their decedent, Charles Coates, was an insulator working in the New Orleans and Baton Rouge area and contracted the disease, diffuse peritoneal mesothelioma, allegedly as a result of his occupational asbestos exposure. Coates began working in the insulation trade in the late 1940's and retired in 1976. Asbestos exposure which allegedly triggered the disease occurred exclusively prior to 1980.[1] Moreover, as the

---

1. In 1980, Louisiana adopted the comparative negligence system of apportioning liability. Prior to 1980, contributory negligence was the law of Louisiana, and liability was allocated on a *pro*

defendants point out, virtually all asbestos-containing products were removed from the marketplace by 1973. Additionally, the latency period for the development of mesothelioma is approximately fifteen to twenty years or longer. Based upon these facts, it is safe to say that most, if not all, of Coates' exposure to asbestos occurred prior to 1980. With these few pertinent facts as a backdrop the Court will address the issues addressed in motions and memoranda addressed to the Court serially in the order set forth above.

## II. ANALYSIS

### 1. Apportionment of liability.

■ In *Cole v. Celotex Corp.*, 599 So.2d 1058 (La.1992), the Louisiana Supreme Court, addressed the precise issue before this Court, to wit:

> As noted, the first issue is whether the provisions of the Louisiana Comparative Fault Law, which was enacted by Act 431 of of 1979 and which became effective August 1, 1980, apply to the instant case commenced after the Act's effective date. At the outset, we observe that this issue has two facets: (i) whether plaintiffs' direct claims [survival actions] are governed by pre-Act contributory negligence, or post-Act comparative fault, law; and (ii) whether the allocation of fault among the defendants who are found to be solidarily liable is governed by pre-Act virile share, or post-Act comparative fault, law. *Id.* at 1062–63.

The *Cole* court recapitulated the transformation of applicable Louisiana law as follows:

> Act 431 of 1979 (effective August 1, 1980) amended LSA–C.C. Art. 2103, changing the basis of contribution among defendants from virile share to percentage of fault. Act 331 of 1984 (effective January 1985), which rewrote the Civil Code provisions on Obligations, moved the rules regarding contribution contained in former LSA–C.C. Art. 2103 to LSA–C.C. Arts. 1804 and

1805. The official revision comments to LSA–C.C. Articles 1804 and 1805 indicate that the revision did not change the law.[2]

In *Cole*, one of the reasons the court granted writs was to resolve the conflict among the state courts of appeal and federal courts on the issue of whether defendants' contribution claims were governed by virile share or comparative fault principles. The dichotomy in the decisions is best illustrated by comparing the Louisiana Third and Fifth Circuit decisions in *Cajun Electric Power Cooperative, Inc. v. Owens–Corning Fiberglass Corp.*, 528 So.2d 716 (La.App. 5th Cir.), *cert. denied*, 531 So.2d 475 (La.1988) and *Lebleu v. Southern Silica of Louisiana*, 554 So.2d 852 (La.App. 3rd Cir.1989), *cert. denied*, 559 So.2d 489–91 (La.1990).

In *Cajun Electric*, the court held that a contribution claim arises at the time of judicial demand. In so holding, the court found that the event which triggers the third party claim in contribution is judicial demand against an alleged tortfeasor. *Id.* at 723. In *Lebleu*, the court held that the 1976 amendment to the workers' compensation law could not be applied retroactively to bar a defendant's third-party action for contribution against executive officers where the plaintiff's claim for silicosis injury arose prior to 1976, but plaintiff's suit and third-party demands were not filed until 1984 and 1985. The *Lebleu* court expressly rejected the federal court precedent in *Ducre v. Executive Officers of Halter Marine, Inc.*, 752 F.2d 976 (5th Cir.1985), stating that it was wrong in overlooking the civil law concept of subrogation of a tort victim's rights to a tortfeasor against other joint tortfeasors arises at the time of the tort.

The Louisiana Third Circuit in *Cole v. Celotex Corp.*, 588 So.2d 376, 385 (La.App. 3rd Cir.1991), *affirmed*, 599 So.2d 1058 (La. 1992), relying on its holding in *Lebleu* explained that "the subrogated tortfeasor steps into the victims shoes, giving him the sub-

---

rata ("by heads") basis. Louisiana Act 431 of 1979, effective August 1, 1980, amended and re-enacted Louisiana Civil Code articles 2103, 2323 and 2324, eliminated the doctrine of contributory negligence and established a comprehensive comparative fault system.

**2.** *Cole v. Celotex Corp.*, 599 So.2d 1058, 1068 n. 31 (La.1992).

stantive right to file a procedural claim for contribution against other tortfeasors."[3]

The Louisiana Supreme Court affirmed the Third Circuit decision in *Cole, supra,* holding that it correctly determined that the contribution rights among the defendants were governed by the same law applicable to the plaintiffs' direct claims. The *Cole* court concluded that the allocation of fault among defendants was governed by pre-Act, virile share ("by heads") principles.[4] The Louisiana Supreme Court in *Cole* set forth its reasoning as follows:

> While neither the amendment to former LSA–C.C. Art. 2103, nor the jurisprudence, resolve the issue of when the right to contribution arises, one commentator provides a logical, consistent approach, which we adopt:
>
> > [T]he substantive right of action for eventual contribution vests at the time of the delict. This construction would explain how the third party practice is available to the joint tortfeasor sued. Thus the joint tortfeasor has a *right* of action from the time of the tort, but the cause of action matures only on payment. Thus at the time of the delict there is vested one cause of action and two rights of action: the injured party has a right of action and cause of action in tort against the joint tortfeasors; the joint tortfeasors as between themselves have a right of action or title to sue for contribution which includes the right to use the third party practice. If one of the tortfeasors pays in excess of his virile portion his vested interest or right of action matures and he acquires a separate cause of action for contribution against his fellow tortfeasor.
>
> > This reasoning does not contradict the *Brown* [*v. New Amsterdam Casualty*

*Company*, 243 La. 271, 142 So.2d 796 (1962) ] decision. The right of action for contribution in *Brown* did not vest at the time of the tort because the amended article 2103 was not yet in effect. On January 1, 1961, the right of action for contribution did vest, along with the right to use the third party practice. The cause of action for contribution will not accrue or mature, however, until payment of an excess of the virile portion.

> Comment, *Contribution Among Joint Tortfeasors: Louisiana's Past, Present, and Future*, Tul.L.Rev. 525, 532 (1963).

599 So.2d at 1071–72.

The parties agree that the Louisiana Supreme Court's decision in *Cole* governs the survival action in that case. OCF submits that there is nothing in the *Cole* opinion which would lead to the conclusion that the Louisiana Supreme Court would treat wrongful death actions any differently from survival actions. This Court agrees for the following reasons upon finding nothing in the *Cole* court's reasoning which either expressly or impliedly limits its holding to the survival action.

Under Louisiana Civil Code Article 2315, a tortfeasor's wrongful act requires him to pay for the damages that result. Additionally, when the tortfeasor's *wrongful act* results in the victim's death, the tortfeasor must also pay damages to the victim's beneficiaries, and this *right survives* for the period of a year following the victim's death. Indeed the beneficiaries' right to those damages originates with the *wrongful act* of the tortfeasor which causes injury and subsequent death. The claim at issue is not simply a death action but a *wrongful* death action. It is essentially a *negligence* cause of action. It

---

**3.** The precise issues before the Louisiana Third Circuit in *Cole* included whether the trial court erred in failing to reduce any verdict by the virile shares of the eleven asbestos manufacturing defendants who were dismissed prior to trial and whether the rights of contribution among the tortfeasors arose before 1976, when executive officers were liable, or after 1976, when executive officers became immune from plaintiffs' suit. 588 So.2d at 384. The Third Circuit specifically held that the trial court erred by failing to apply

pre-comparative fault principles in apportioning liability, finding the record replete with evidence that plaintiffs' causes of action accrued prior to the Louisiana Comparative Fault Law, effective in 1980. It further found the principles of contributory negligence was available as a defense to the sole defendant in the case, the liability insurer of the executive officers.

**4.** *Cole*, 599 So.2d at 1072.

merely adds to the article 2315 formula another party and another event, i.e., in addition to the tortfeasor's fault, and the victim's injury, in the event that the victim dies on account of the injury, his survivors may recover from the tortfeasor for the damage they sustain as a result of the victim's death.

The *Cole* court's reasoning is both instructive and analogous to the instant case.[5] In *Cole,* the Louisiana Supreme Court noted the difficulties in applying traditional personal injury concepts to asbestos-related disease cases, to wit:

> The difficulties in asbestosis cases arise, because, unlike in traditional personal injury cases in which the damage results from a single, identifiable act causing traumatic injury, in asbestosis cases the damage results from a continuous process—a slow development of this hidden disease over the years. Compounding the problem, asbestosis cases are characterized by a lengthy latency period—typically ranging a decade or two—and, consequently, a lengthy temporal separation between the tortious conduct and the appearance of injury. This lengthy latency period renders the efforts to pinpoint the date on which the disease was contracted virtually impossible, medically and legally. Further, this inability to pinpoint when injuries were sustained in asbestosis cases renders determining the date on which a plaintiff's cause of action accrued a herculean task.[6]

The *Cole* court reached the following conclusions:

> We conclude that the key relevant events giving rise to a claim in long-latency occupational disease cases are the repeated tortious exposures resulting in continuous, ongoing damages, although the disease, may not be considered contracted or manifested until later. We further conclude that when the tortious exposures occurring before Act 431's effective date are significant and such exposures later result in the manifestation of damages, pre-Act law applies.[7]

Essentially, the *Cole* court ruled that the key factor in determining the applicable law in long-latency occupational disease cases was the time of exposure, to wit: "Our reliance on significant, continuous pre-Act exposures as the key factor in determining the applicable law is supported by the empirical evidence."[8] The Louisiana Supreme Court in *Cole* cited the Washington state appellate court decision in *Koker v. Armstrong Cork, Inc.,* 60 Wash.App. 466, 804 P.2d 659 (1991) with approval and reiterated: " '[b]ecause the harm here results from exposure (continuous in nature), it appears that substantially all of the events which can be termed 'injury producing' occurred prior to the adoption of the Act.' " 599 So.2d at 1067.

That the victim may eventually die as a result of long-term disease resulting from continuous pre-Act exposure is simply the beginning of the end point of prescription of the long-term damage/death claim. The date when the damage/injury was sustained is the wrong focus in determining the applicable law. The Louisiana Supreme Court in *Cole* focusses instead upon the wrongful or tortious conduct (i.e., when the significant, continuous exposure occurred) as the key factor in determining what law applies).

It is this Court's opinion based upon the foregoing discussion of Louisiana law, and assuming substantial injury/death producing exposures giving rise to plaintiffs' claims occurred before the August 1, 1980, the effective date of Louisiana Comparative Fault

---

5. The *Cole* court found that the key relevant events giving rise to a claim in a long-latency occupational disease cases are the repeated tortious exposures resulting in long-term damages. 599 So.2d at 1066. Thus, the court concluded when *tortious exposures* occurring before Act 431's effective date are significant and such exposures later result in the manifestation of damages. *Id.* Plaintiffs argue that under *Cole,* pre-Act 431 law would apply to the Coates wrongful death action since the repeated tortious exposures occurred prior to 1976

and there is no disputing that these exposures caused his death. See Plaintiffs' Supplemental Memorandum on Apportionment of Liability in Wrongful Death Action, at p. 2.

6. 599 So.2d at 1065–66.

7. *Id.* at 1066.

8. *Id.*

Law,[9] that the provisions of Louisiana Comparative Fault Law are inapplicable and this case is governed by pre-Act law.

In making this determination the Court considers the parallels between contribution and wrongful death claims. Both are essentially derivative claims, which each add to the negligence cause of action formula simply another event (i.e., payment of the claim in the case of contribution and death of the victim in the case of wrongful death) and another party (i.e., co-tortfeasors in the case of contribution and beneficiaries in the case of wrongful death). Speaking of the wrongful death action, much the same as contribution, while the right of action vests at the time of the tort, the cause of action for wrongful death does not accrue or mature until the happening of a later event (i.e., death of the victim in the case of wrongful death and payment of the claim in the case of contribution). Civil Code Article 2315 (i.e., the version that was in effect at the time plaintiff's filed suit and at the time Coates was injured) reads in pertinent part:

> Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
>
> .　　.　　.　　.　　.
>
> The *right* to recover all other damages caused by an offense or quasi offense, if the injured person dies, shall survive for a period of one year from the death of the deceased.... The survivors in whose favor this right of action survives may also recover the damages they sustain through the wrongful death of the deceased.

Article 2315 clearly speaks in terms of *the* right to recover damages and states that, in the event that the injured person dies, such right shall survive one year from the date such right shall survive one year. Simply stated, the *right* to recover damages, including *wrongful* death damages, vests prior to the actual death of the victim and is inherited by his beneficiaries upon the victim's death. However, the *right* of action survives only for a period of one year from the death of the deceased in favor of the beneficiaries.

*Cole* specifically rejected "accrual" of the cause of action as the test of what law applies. The court explained that the date upon which the cause of action accrues is a legal fallacy which has resulted in various misinterpretations throughout the years. The *Cole* court rather adopted the "significant exposure" test to determine the law applicable to negligence causes of action in long-term latency disease cases.

The Court, having considered the submissions of the parties and the law applicable to the instant case, is of the opinion that both plaintiffs' direct claims for wrongful death, and the allocation of fault among defendants are governed by pre-Louisiana Comparative Fault Act principles. In summary, the trigger for the applicable law is "exposure" to the injury producing harm, whether the case is a survival action or a wrongful death action.

2. Motion for Order that Asbestos Containing Products Are As A Matter of Law Unreasonably Dangerous Per Se.

■ In *Johnstone v. American Oil Co.,* 7 F.3d 1217 (5th Cir.1993), a mesothelioma death case, the Fifth Circuit held that whether asbestos-containing products were unreasonably dangerous *per se* is a jury issue.[10] In *Johnstone,* the jury determined that the defendant's products were not unreasonably dangerous *per se.* The Fifth Circuit reversed the magistrate's JNOV setting aside the jury's verdict, and explained:

> In setting aside the jury's verdict, the magistrate judge seems to have focussed on the risks to Mr. Johnstone, as opposed to the risks to society as a whole. A product's risk "concerns not only the quali-

---

9. Louisiana Act 431 of 1979. "Act 431 amended and re-enacted LSA–C.C. Articles 2103, 2323 and 2324 to usher into Louisiana a comparative fault system. The Act also amended and re-enacted LSA–C.C.P. Articles 1811 and 1917 to adjust for changes in the Civil Code articles. Simply put, the Act eliminated the doctrine of contributory negligence and 'provide[d] the framework for a comprehensive scheme of loss apportionment in multiple party litigation.'" *Cole,* 599 So.2d at 1062 n. 13.

10. *Johnstone* was a case under the general maritime law which adopted Louisiana law as the law of the adjacent state.

tative harm or 'incidence' of serious adverse effects, that is, the ratio of instances of harm compared to the total use or consumption of the product." If the risks of a product were viewed only from the perspective of the injured plaintiff, most any product that caused a non-negligent injury would likely be found unreasonably dangerous per se.

\*     \*     \*     \*     \*     \*

Considering all of the evidence of the risks and utility of Keene's asbestos-containing insulation products to society as a whole, in a light most favorable, we conclude that it is of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions. Accordingly, the plaintiff's motion for JNOV should have been denied. We therefore reverse the judgment.

The Court, having considered the opposition briefs filed on behalf of Flintkote Company and OCF, as well plaintiffs' memorandum in support of motion and response to defendant's opposition, denies plaintiffs' motion for an order that asbestos-containing products are unreasonably dangerous per se as a matter of law and prohibiting the introduction of state of the art evidence by defendants.

3. Relevance of OSHA and EPA standards.

█ In support of their case-in-chief and pursuant to FRE Art. 803(8), plaintiffs seek to introduce evidence of position papers published by the Occupational Safety and Health (OSHA) and Environmental Protection Agency (EPA), which make findings of fact concerning the health effects of asbestos exposure.

The admissibility of various government documents was discussed in the recent Supreme Court decision in, Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 109 S.Ct. 439,

102 L.Ed.2d 445 (1988). Therein, the court held that FRE 803(8)(c) permits introduction of evidence in the form of public reports which (1) set forth factual findings; (2) were made pursuant to authority granted by law; and (3) are found to be trustworthy. Id. at 159–63, 109 S.Ct. at 445–46. The Beech Aircraft court found that the trustworthiness inquiry was the Committee's primary safeguard against the admission of unreliable evidence. Id. at 167, 109 S.Ct. at 448.

It is undisputed that the EPA and OSHA position papers in question set forth factual findings and were not only made with authority granted by law but were actually required to be made by law. It is their "trustworthiness" with which the defendants take issue. Defense counsel argues that: (1) the admission of OSHA regulation would impermissibly alter the civil standard of liability;[11] (2) OSHA and EPA standards are irrelevant to the issue of the defendant manufacturers' liability since they only pertain to an employer's conduct and the defendant manufacturers in this case are not employers of the plaintiffs; (3) OSHA Position paper and EPA regulations are not required to be scientifically accurate and both OSHA and EPA are permitted to "over protect" and thus, exaggerate their findings; and finally (4) OSHA Reports and EPA Rules bear the imprimatur of the Government and will unduly influence the jury.

Turning to the trustworthiness issue, the investigations at issue meet the "timely" criteria in that both came after exhaustive epidemiology and risk assessment studies were completed. Neither agency has an interest in this litigation and both are charged by law with the responsibility of regulating toxic substances. Defendants do not attack the skill of those making the investigations at issue, but rather, obliquely suggest that the studies are politically influenced and thus, not based upon objective and impartial scientific research. However, the subject publica-

---

11. Defendants contend that the use of OSHA standards to enlarge or alter civil liability is prohibited by statute citing the Act, to wit:

Nothing in this chapter shall be construed to supersede or in any manner affect any worker's compensation law or to enlarge or dimin-

ish or affect in any manner the common law or statutory rights, duties or liabilities of employers and employees under any law with respect to injuries, disease, or death of employees arising out of, or in the course of, employment. 29 U.S.C. § 653(b)(4).

tions issued only after lengthy hearings which involved substantial testimony and cross-examination concerning the health effects of exposure to asbestos products and consideration of a plethora of epidemiologic studies and risk assessment data.

OSHA findings of fact made in the course of its amendment of its previous standard regulating occupational exposure to asbestos were actually required to be made by the United States Supreme Court in *Industrial Union Dept. v. American Petroleum Institute*, 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980).

The admissibility of various government documents has been discussed in numerous federal decisions. See, *In re Aircrash in Bali Indonesia*, 871 F.2d 812 (9th Cir.1989), citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) (allowing opinions and conclusions as factual findings and affirming the admissibility of an FAA report); *Ellis v. International Playtex, Inc.*, 745 F.2d 292 (4th Cir.1984) (concluding in a wrongful death action against a tampon manufacturer that the lower court committed reversible error in excluding Center for Disease Control and Tri-State studies on toxic shock syndrome);[12] *Muncie Aviation Corporation v. Party Doll Fleet, Inc.*, 519 F.2d 1178, 1182–83 (5th Cir. 1975) (upholding the decision of the trial court allowing evidence of advisory material used by the FAA for the stated reason that "[t]heir trustworthiness is guaranteed by the fact that they were recently published by a governmental agency whose only conceivable interest was in insuring safety and whose recommendations 'should have probative value regarding national, state, or local practice.' ").

In *Cole v. Celotex*, 588 So.2d 376 (La.App. 3rd Cir.1991), an asbestos-related disease case, the court found OSHA and EPA reports admissible over the hearsay objection of the defendants and that the publications were trustworthy, relevant, and that their probative value substantially outweighed any prejudice. Accordingly, the appellate court held defendant's assignment of error was without merit, citing *In re Aircrash in Bali Indonesia*, *Beech Aircraft*, *Ellis*, and *Muncie*, supra. *Id.* at 386–87.

The Louisiana Second Circuit in *Manchack v. Willamette Industries, Inc.*, 621 So.2d 649, 652–53 (La.App. 2nd Cir.), *cert. denied*, 629 So.2d 1170 (La.1993) held that OSHA standards are relevant to work-place safety issues even if the injured party is not an employee. The *Manchack* court explained its holding as follows:

> Louisiana courts have recognized that "while statutory violations are not in and of themselves definitive of civil liability, they may be guidelines for the court in determining standards of negligence by which civil liability is determined." Under this reasoning, OSHA standards are certainly relevant to the safety of a work place, even if the injured party is not an employee. In fact, the court in *Melerine* [*v. Avondale Shipyards, Inc.*, 659 F.2d 706 (5th Cir. 1981) ], supra, explained that a plaintiff may "properly offer a statute or regulation [such as OSHA] as evidence of a defendant's negligence even when that statute or regulation cannot be used to establish negligence *per se*."[13]

The *Manchack* court cited Professors Keeton and Prosser summarizing the concept as follows:

**12.** The *Playtex* court found that defendant's concern about the methodology of the studies should have been addressed to the relative weight accorded the evidence and not its admissibility. The court found this position consistent with the rationale behind the 803(8)(C) exception, stating: "Although the rule is designed to assume the admissibility of a report in the absence of affirmative indicia of untrustworthiness, there is no indication that Congress intended for the reports to escape searching examination." 745 F.2d at 303. The court explained that allowing the jury to evaluate the reports after careful cross-examination and the presentation of expert testimony

serves these functions well. The *Playtex* court further explained that the weight a juror might ascribe to the data would turn on the credibility and persuasiveness of the experts that each side offered to explain the data. The court further opined that if one side failed to explain the data adequately, the jury would be entitled to give it little weight, but, the absence of such expert testimony does not affect the admissibility of the data. *Id.* at 304.

**13.** *Manchack v. Willamette Industries, Inc.*, 621 So.2d 649, 652 (La.App. 2nd Cir.1993).

"[W]here the statute does set up standard precautions, although only for the protection of a different class of persons, ... this may be a relevant fact, having proper bearing upon the conduct of a reasonable man under the circumstances, which the jury should be permitted to consider. There is, in other words, a statutory custom, which is entitled to admission as evidence." [14]

■ As to defendant manufacturer's argument that OSHA itself proscribes the use of its regulations so as to impermissibly alter the civil standard of liability, such proscription is wholly irrelevant in this case. The defendants in this case are manufacturers of asbestos-containing insulation products and not the decedent's employers. Defendants admit that much in their argument to the effect that OSHA and EPA standards are irrelevant to the issue of the defendant manufacturers' liability since they only pertain to an employer's conduct.

Finally, as to the defendant's argument to the effect that OSHA and EPA records bear the imprimatur of the government and thus, will impermissibly/unduly influence the jury, this Court simply disagrees. The Court will, however, consider any proposed jury instruction submitted by any party with regard to the subject documents, in connection with the admission of OSHA and EPA publications into evidence.

The Court concludes the OSHA and EPA publications plaintiffs seek to introduce satisfy all of the *Beech Aircraft* requirements, since they are factual findings made by government agencies pursuant to authority granted by law, and their trustworthiness has been established. The Court further finds that these documents are relevant to the issues joined in this case. Moreover, the Court is of the opinion that their probative value greatly outweighs the potential for unfair prejudice, if any. Finally, the Court will consider any jury instruction designed to diffuse the potential for any unfair prejudice perceived by the defendants in this case on account of the admission of OSHA and EPA documents. For all of the reasons aforestated the Court is finds that the OSHA and EPA publications at issue constitute competent evidence and are admissible as evidence in the trial of this case.

4. Defendant OCF's motion to exclude evidence of medical expenses paid by third parties.

■ OCF has moved the Court to exclude evidence of medical costs paid by Provident and Medicare on grounds that: (1) through *legal* subrogation, both Provident Life and Medicare have a distinct or independent cause of action against it for medical care and expenses paid on behalf of the plaintiff and defendants may be tasked to pay twice; and (2) recovery of medical expenses from insurers as well as tortfeasors would constitute a windfall.

Although a person pays another's debt, that person does not acquire automatically the right to step in the "shoes" of the creditor and thereby insist that the debtor reimburse him for satisfying the debt. The Louisiana Civil Code provides subrogation takes place only by written contract executed between the parties or by operation of law under certain limited conditions. Here, defendants do not contend that third parties right of subrogation was acquired conventionally. In this case defendants argue subrogation took place by operation of law as provided in Louisiana Civil Code Article 1829.

Article 1829 provides that subrogation, absent conventional reservation, takes place "in favor of an obligor who pays a debt he owes with others or for others and who has recourse against those others as a result of the payment." La.Civ.Code Art. 1829(3).[15]

The earliest reported decision finding that legal subrogation does not take place in favor of an insurer is *D.R. Carroll & Co. v. New Orleans, J & G.N. R.R. Co.*, 26 La.Ann. 447 (La.1874). Affirming such prior holding, in

14. *Id.* at 652–53 (citations omitted).

15. The Louisiana subrogation articles amended in 1984, substantially track their predecessor articles enacted in 1870. The language used in article 1829(3) is identical in all respects to the expressions contained in the 1870 version (i.e. article 2161(3)).

*Forcum–James Co., Inc. v. Duke Transportation Co.*, 231 La. 953, 93 So.2d 228 (1957), the Louisiana Supreme Court specifically rejected a claim by an insurer against a tortfeasor grounded solely on the theory of legal subrogation, stating:

> It is a basic principle of law that a tortfeasor is responsible only for the direct and proximate result of his acts and that, where a third person suffers damage by reason of contractual obligation to the injured party, such damage is too remote and indirect to become the subject of a direct action *ex delicto*, in the absence of subrogation.

The court in *Harris v. Huval Baking Co.*, 265 So.2d 783 (La.App. 3rd Cir.1972), *cert. denied*, 263 La. 103, 267 So.2d 210 (1972) rejected the insurers "alleged right" to proceed by legal subrogation against the wrongdoer for medical expenses paid to the insurer.[16]

In *Hartford Accident & Indemnity Co. v. Byles*, 280 So.2d 624 (La.App. 3rd Cir.1973) the court held that in a case involving an insurer's claim that it was legally subrogated to the rights of the insured against the uninsured motorist and that article 2161(3) was applicable.[17] However, the Louisiana Third Circuit expressly distinguished and reaffirmed its precedent in *Huval*, stating:

> [T]he insurer in the *Harris* case was not bound with or for the third party tortfeasor for the hospital and medical expenses incurred by Harris. It was bound under its contract to pay hospital, medical and surgical benefits to its insured, whether anyone else might or might not also owe them. The obligation of the insurer was not conditioned on the negligence or the liability of a third person, and the insurer thus was not bound with or for anyone else for the payment of those expenses.

The Louisiana Fourth Circuit in *Courtney v. Harris*, 355 So.2d 1039 (La.App. 4th Cir. 1978), followed *Huval* and dismissed the claim by a health insurer. Without exception Louisiana jurisprudence is consistent in rejecting all attempts by insurers to recoup *medical benefits* paid pursuant to terms of *health policies* in tort cases by mere reliance on the theory of legal subrogation.[18]

In *Wheelahan v. Eller*, 446 So.2d 442 (La. App. 4th Cir.1984), *cert. denied*, the court cited the trilogy of cases which applied article 2161(3)[19] and recognized the claims of insurers for recovery of *property* and *uninsured motorist* coverage payments made to the insured in tort cases. It distinguished those cases and held that the insurer was not legally subrogated insofar as medical payments were concerned. The *Wheelahan* court rejected the argument regarding the lowering of premiums being a public policy consideration, stating.

> The public policy considerations urged by intervenor are without merit. To deny subrogation will not result in the wrongdoer escaping responsibility as suggested by intervenor.... The "collateral source rule" prevents such a "windfall" to the defendant. On the other hand, plaintiff's insurance recovery is what she paid for; the proceeds are "net" after considering the premium payments. 446 So.2d at 445.

In the concurring opinion, Judge Redmann observed:

> A medical insurer is not significantly different from a life insurer in this respect. Medical insurance benefits similarly constitute a return of the insureds' and other insureds' own premium money.

In *Aetna Insurance Company v. Naquin*, 488 So.2d 950 (La.1986), the Louisiana Su-

---

**16.** See also, *Courtney v. Harris*, 355 So.2d 1039 (La.App. 4th Cir.1978); and *American Indemnity v. New York Fire & Marine Underwriters, Inc.*, 196 So.2d 592 (La.App. 1st Cir.1967).

**17.** In other *property* loss cases, courts have adopted the reasoning of *Byles* and allowed insurers to proceed by legal subrogation. See *Volume Shoe Corporation v. Armato*, 341 So.2d 611 (La.App. 2nd Cir.1977); *Sentry Indemnity Co. v. Rester*, 430 So.2d 1159 (La.App. 1st Cir.1983).

**18.** See, *Martin v. Louisiana Farm Bureau Casualty Insurance Company*, 628 So.2d 1213 (La.App. 3rd Cir.1993).

**19.** *Volume Shoe*, 341 So.2d 611 (hazard insurer); *Byles*, 280 So.2d 624 (uninsured motorist carrier); and *Sentry Indemnity Co. v. Rester*, 430 So.2d 1159 (La.App. 1st Cir.1983) (casualty/fire insurer).

preme Court allowed a *property* insurer's claim against a negligent contractor for reimbursement of funds paid to tenants on behalf of the insured landlord. The *Naquin* court held:

> In this case Aetna was bound with Naquin for the damages to tenants. Aetna was bound for a different reason than Naquin *but they were bound for the same thing.*[20] It is unnecessary to examine the relationship of the parties for solidarity as we have concluded that LSA–C.C. art. 2161(3) does not require solidarity. Therefore we hold that Aetna, having paid a debt which they were bound with Naquin, is entitled to be legally subrogated to their insured's breach of contract action against Naquin.

*Id.* at 954 (emphasis added).

In the most recent case dealing with the issue of whether the health insurer is legally subrogated for payments made, the Louisiana Fourth Circuit in *Martin v. Louisiana Farm Bureau Casualty Insurance Company*, 628 So.2d 1213 (La.App. 3rd Cir.1993) recognizing that Louisiana's judicial scheme required it to apply the last expression of the highest court found that the *Naquin* decision did not *impliedly* overrule its prior precedent in *Huval*, which involved a health insurer. The *Martin* court explained:

> Citing the Aetna decision, the insurer in this case argues our decision in *Huval* is "fatally" flawed and demands reversal because we in part relied on the *Pringle* [– *Associated Mortgage Corp. v. Eanes*, 254 La. 705, 226 So.2d 502 (1969) ][21] decision. We do not share the insurer's belief that the Supreme Court in *Aetna* impliedly overruled *Huval* and the well reasoned cases which followed. Our opinion, in this regard, is buttressed by the recognition that the *Huval* and *Wheelahan* decisions did not hinge solely on the soundness of

the *Pringle* holding thus discussed. While the *Pringle* case is certainly mentioned in *Huval,* we also relied on the Supreme Court's decision in *Forcum–James* and noted with approval the court's recognition that certain intervenors "can readily protect themselves by obtaining from the injured person a conventional subrogation of the latter's right and, thus, the tort-feasor can be made to respond for the direct and foreseeable consequences of his act in a single suit." See *Marquette Casualty Company v. Brown* [235 La. 245] 103 So.2d 269 (La.1953); and *American Indemnity Co. v. New York Fire & Marine Underwriters, Inc.,* 196 So.2d 592 (La.App. 1st Cir.1967). The *Forcum–James* decision did not turn on the presence or absence of "solidarity" between the parties. Rather, it too reflected a public policy recognition that in certain matters the law should not spread its protection so far and "open the door to prosecution of claims for damages indirectly and remotely connected with the tortious act and encourage a multiplicity of suits from which numerous conflicts of interest might ensue." For more than thirty years, the courts of this State have cited with approval the referenced passages appearing in the Forcum–James case in rejecting persistent attempts by health insurers to bypass the conventional method well recognized in our subrogation law for protecting their "alleged" right to recoup medical expenses paid as a consequence of tortious injuries. We do not believe the time has come to abandon such jurisprudence and to usurp the people's ultimate authority, through the collective wisdom of our scheme for assuring the realization of the "salutary" benefits mentioned in Professor Johnson's article. Through our research, we have discovered as well, that in the cases where health insurers have

---

**20.** Unlike *Naquin,* it cannot be seriously argued in the case at bar that the defendant tortfeasors and non-party health insurers are bound for the same thing. The Plan, which may have paid some medical benefits on behalf of Coates and for which benefits the defendant tortfeasor's seek a credit, was funded by employer contributions and was part of a collectively bargained for wage package.

**21.** The *Naquin* court pointed out that its prior statement in *Pringle,* to the effect that article 2161(3) presupposes the existence of a solidary obligation, was *obiter dictum.* It further noted several court of appeal opinions which cited that statement as authority for denying an insurer's claim to legal subrogation, including *Courtney v. Harris,* 355 So.2d 1039 (La.App. 4th Cir.1978) and *Harris v. Huval Baking Co.,* 265 So.2d 783 (La.App. 3rd Cir.1972). 488 So.2d at 953.

sought subrogation relief predicated upon common-law or equitable principles, they also have not been successful. Medical Insurer's Right of Subrogation, 73 ALR3d 1140 @ 3, p. 1147. Not a single court in the United States of America, at least in any reported case, has adopted the position advanced by the insurer in this case and we decline to stand alone.

The *Martin* court went on to point out that unlike property and certain other casualty policies, health insurance payments generally are contingent on assumption by the insured of certain annual "deductible" medical expenses for each family member and provide for maximum benefit payments which are often "substantially" less than the total cost actually incurred by the insured. Additionally, unlike property/casualty insurance, the obligation to pay benefits under a health policy arises without regard to the etiology of a particular medical condition. The *Martin* court commented:

> As suggested in *Wheelahan*, if we adopt the health insurer's position is it not also an exercise in "semantics" to deny a life insurer the right to legal subrogation for death benefits against a tortfeasor? Our holding in this case likewise serves a "salutary policy" by recognizing the rights of insureds to fairly negotiate the terms of insurance contracts in a competitive market and this State's legislative power to protect the public's economic interest in lowering the cost of health insurance without opening the "floodgate" to litigation.

In *Surgi v. Otis Elevator Co.,* 541 So.2d 297 (La.App. 5th Cir.1989), a post-*Naquin* decision, the Louisiana Fifth Circuit rejected defendant tortfeasor's contention that the jury was entitled to find that the plaintiff had no claim for medical expenses which had

been paid by others. The *Surgi* court explained:

> In the case of medical expenses, this argument has no merit, although AT & T did pay for at least half the medical expenses incurred by Mrs. Surgi. The collateral source rule is explained in *Hall v. State, Department of Highways,* 213 So.2d 169, 175 (La.App. 3rd Cir.1968), *cert. denied,* [252 La. 959] 215 So.2d 128 (La.1968), as follows:
>
>> While a tortfeasor is entitled to credit for payments made through insurance procured by the tortfeasor himself, the plaintiffs recovery in tort is not diminished because of payments made through insurance of other collateral sources independent of the wrongdoer's procuration or contribution. . . .

541 So.2d at 300.[22]

In the case at bar, benefits paid by Provident Life were pursuant to a welfare plan administered by Local 53 of the Asbestos Workers Union of which the decedent Charles Coates was a member. The Plan was funded by employer contributions and was part of a collectively bargained wage package. Thus, to the extent that any money was paid to or on behalf of Coates from this source, it was as a result of the diversion of his hourly wages. It is a collateral source in the classic sense.[23] The instant case is even stronger than *Martin, Huval,* and *Wheelahan,* supra, since the health insurers in this case have not sought to recover any sums paid to or on behalf of Charles Coates, at all. Rather, here, defendants seek to diminish plaintiff's recovery because of payments made through insurance of other collateral sources independent of their procura-

---

**22.** See also, *Alford v. Woods,* 614 So.2d 1299 (La.App. 3rd Cir.1993), *cert. denied,* 617 So.2d 915 (La.1993) (citing *Hall v. State, Department of Highways,* 213 So.2d 169 (La.App. 3rd Cir.1968), *cert. denied,* 252 La. 959, 215 So.2d 128 (1968), *Surgi v. Otis Elevator Co.,* 541 So.2d 297 (La.App. 5th Cir.1989) and *Friedmann v. Landa,* 573 So.2d 1255 (La.App. 4th Cir.1991) and rejecting the defendant's contention that the trial court erred failing to diminish plaintiff's tort recovery because of payments made through insurance of

other collateral sources independent of the wrongdoer's procuration and contribution.).

**23.** In this vein, the *Martin* court queried: "Is it not in keeping with sound public policy to allow those who acquire group policies, in particular, often in part funded by employers, to insist that carriers in the insurance contracts bind themselves in writing to adjust premium cost by factoring in the sums recovered from third party tortfeasors within a definite period of time?"

tion or contribution which is clearly not sanctioned under Louisiana law.[24]

As to Medicare Benefits, the rule is that any right of action by the government for reimbursement would be against the beneficiary who received it and not against the defendants. For all of the above and foregoing reasons, OCF's Motion to Exclude Evidence of Medical Expenses paid by Third Parties is hereby DENIED.

### 5. OCF's Motion To Exclude Evidence of Survivor's Mental Anguish.

In *Matthews v. Turner*, 566 So.2d 133, 135 (La.App. 5th Cir.1990), *cert. denied*, 571 So.2d 645 (La.1990), the Louisiana Fifth Circuit Court of Appeals recognized that an award for mental anguish for seeing a child or close relative suffer or perish is now mandated by *Lejeune v. Rayne Branch Hospital*, 556 So.2d 559 (La.1990). The *Matthews* court affirmed an award of $50,000.00 to a mother for her own mental anguish at watching her daughter die over the period of several days of acute appendicitis with generalized peritonitis. The daughter's (Sabrina's) condition had been misdiagnosed as a urinary tract infection. In affirming the award, the court observed that "Mrs. Matthews' despondent plight during Sabrina's fatal illness is well-documented in the record" and refused to modify the award of $50,000 since there were no judicial guidelines.

The Court, having considered the submissions of the parties, is of the opinion that *Lejeune* and *Matthews*, supra, control the disposition of this issue. Accordingly, defendant's Motion to Exclude Evidence of decedent's wife Louella Coates' mental anguish is DENIED.

### 6. OCF's Motion for Reverse Bifurcation of the Trial.

In this case there is not disputed that the plaintiff died from diffuse peritoneal mesothelioma, which is an asbestos-related disease. As to defendant's argument that set-

tlement will more likely be facilitated once damages are fixed, that simply has not been the experience of this Court in the *recent* past. Finally, the Court agrees with the argument of plaintiff, to the effect that judicial economy will not be served should the Court be required to empanel, not one but two juries (i.e., one for damages and sometime in the future one to decide the issue of liability). The Court is of the opinion that all of the issues joined should be the subject of scheduled trial. Moreover, the Court is hard-pressed to reverse bifurcate the proceedings at this late date over the objection of the plaintiffs, who apparently have prepared to try their entire case.

Accordingly and for all of the above and foregoing reasons,

IT IS ORDERED that plaintiffs' wrongful death action is governed by pre-Louisiana Comparative Fault law negligence principles and apportionment of liability *vis a vis* the defendants shall be on a virile share ("by heads") basis.

IT IS FURTHER ORDERED that plaintiffs' motion for an order that asbestos-containing products are unreasonably dangerous *per se* as a matter of law is hereby DENIED.

IT IS FURTHER ORDERED that plaintiffs' motion to admit OSHA and EPA publications is hereby GRANTED.

IT IS FURTHER ORDERED that OCF's motion to exclude evidence of medical expenses paid by third parties is hereby DENIED.

IT IS FURTHER ORDERED that OCF's motion to exclude evidence of mental anguish of Mrs. Louella Coates is hereby DENIED.

IT IS FURTHER ORDERED that OCF's motion for reverse bifurcation of the trial is hereby DENIED.

---

**24.** See, *Alford v. Woods,* 614 So.2d 1299 (La.App. 3rd Cir.1993), *cert. denied,* 617 So.2d 915 (La. 1993) (a post-*Naquin* decision); *Hall v. State, Department of Highways,* 213 So.2d 169 (La.App. 3rd Cir.1968), *cert. denied,* 215 So.2d 128 (La.

1968); *Surgi v. Otis Elevator Co.,* 541 So.2d 297 (La.App. 5th Cir.1989) (a post-*Naquin* decision); and *Friedmann v. Landa,* 573 So.2d 1255 (La. App. 4th Cir.1991) (a post-*Naquin* decision).